UNITED STATES of America, Plaintiff,

v.

**WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.**

UNITED STATES of America, Plaintiff,

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.**

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court,
District of Columbia.

Nov. 1, 1983.

James P. Denvir, III, Michael F. Alt-schul, Luin P. Fitch, Jr., J. Philip Sauntry, Jr., Richard Levine, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Howard J. Trienens, Jim G. Kilpatric, John D. Zeglis, Francine Berry, New York City, for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

The Operating Companies have petitioned the Court for a ruling pursuant to section VIII(C) of the decree [1] that, in particular areas (see *infra*) [2] they be permitted to offer mobile radio services across LATA boundaries.[3] The Operating Companies claim that, without the requested relief, they will be significantly hindered in their legitimate efforts to provide important new services, particularly cellular radio,[4] and they will be forced unnecessarily to dismantle existing systems [5] which have transmitters in two or more LATAs. Comments in response to the petition have been received from the Department of Justice, the Federal Communications Commission, and numerous intervenors,[6] some of them objecting to the requested relief.

### I

Mobile radio services are radio communication services in which, in contrast to the typical communication over the land-based telephone network, either the transmitting

---

1. Section VIII(C) provides that the restrictions upon the types of services which may be provided by the Operating Companies may be lifted "upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." The petition presently before the Court seeks removal, in part, of the decree's prohibition on the offering by the Operating Companies of inter-LATA (or "interexchange") telecommunications services.

2. The Operating Companies have reserved the right to petition the Court in the future to provide mobile radio services in areas that are not encompassed by this application. The Court, of course, intimates no opinion as to the merits of such future applications.

3. LATAs (or "exchange areas" under the decree) are described in this Court's Opinion of April 20, 1983. See *United States v. Western Electric*, 569 F.Supp. 990 (D.D.C.1983).

4. Cellular radio is described at pp. 646-647 *infra*.

   A wholly-owned subsidiary of AT & T has applications on file with the Federal Communications Commission to provide cellular mobile telephone service throughout the major metropolitan areas, and a number of licenses have apparently already been granted to this subsidiary. See *Washington Post*, August 27, 1983, at D8. Under the plan of reorganization, the AT & T subsidiary will then be spun off into seven regional holding companies. It is the regional companies, not the individual Operating Companies, which will provide cellular radio services after divestiture. See, Plan of Reorganization at 385-89; First Supplemental Certification of Jack MacAllister, designated chief executive of the Mountain-Northwest region, May 19, 1983, at 2.

5. The plan of reorganization provides that the resources required to provide mobile radio services independently of AT & T will be retained by or transferred to the Operating Companies, with the exception of the equipment located in subscribers' vehicles (on the theory that this is customer premises equipment to be retained by AT & T). Plan of Reorganization at 383.

6. These comments were filed pursuant to a briefing schedule established by the Court on April 22, 1983.

or the receiving station is mobile.[7] The Bell System companies presently provide several different types of mobile radio services which use radio frequencies to permit either one-way communications (such as with paging systems) or two-way communications (such as with mobile radio telephone systems) between mobile units and the land-based telephone network.[8] Although different technologies are used in the various types of systems, each requires the use of radio transmitters and receivers as well as central control facilities.[9] Transmission facilities connect the central control facilities to the radio transmitters, and they also connect the central control facilities to the landline telephone network.[10]

All parties to this proceeding are in agreement regarding this basic technology as well as regarding two of the relevant issues. First, mobile radio services are "exchange telecommunications services" within the meaning of section II(D)(3) of the decree, and on this basis their provision by the Operating Companies within LATA boundaries does not, under the decree, require special Court approval.[11] Second, the transmitters of a number of existing systems send out powerful radio signals which do not and cannot conform strictly to the geographic boundaries of the LATAs: they will inevitably be received by mobile units located outside the LATA from which they originate.[12]

The dispute here relates to those systems, existing or planned, which have a capability to provide wider service across LATA boundaries because (1) their transmitters are located in more than one LATA and (2) they are connected to a single central control facility to form an integrated, multi-LATA system.[13] Such systems con-

---

7. These mobile radio services include two-way land mobile radio telephone service, one-way paging service, air-ground radio service, VHF and coastal harbor maritime mobile service, and cellular mobile radio telecommunications service. See Bell System Memorandum, May 9, 1983 at 2 n. *. A service which is referred to as "rural radio service" was at one time listed in the Operating Companies' request, but it is the Court's understanding that this service—which often substitutes for normal telephone lines between rural central offices and remote households—is no longer included among those for which relief is sought. See Department of Justice Memorandum, May 19, 1983, at 3.

It should also be noted that the Operating Companies' petition initially referred to "public radio services" rather than "mobile radio services." This led several intervenors to file objections, on the ground that any relief granted by the Court to provide radio services across LATA boundaries might be understood to apply not only to mobile radio services but also to fixed radio services (such as digital termination service (DTS)) or even to common carrier communication services for which FCC radio licenses are required (such as ordinary microwave transmissions). These concerns are moot, however, because the Operating Companies, as well as the Department of Justice, have since stated that the requested relief sought by this petition would reach only mobile radio services. See AT & T Memorandum, May 19, 1983, at 15 n. *; Department of Justice Memorandum, May 19, 1983, at 3.

8. These systems vary in their degrees of technical sophistication, from the simple paging unit, which is capable merely of receiving an audible

tone, to mobile telephone service, which enables the mobile unit to receive and transmit simultaneously, just like an ordinary telephone.

9. These are known as "central control facilities" in conventional two-way mobile systems, as "paging terminals" in paging systems, and as "mobile telecommunications switching offices" in cellular radio systems. AT & T Response to Comments, November 23, 1982, at 27 n. *.

10. The central control facilities are generally connected to the telephone network through dedicated facilities in the same basic manner that a PBX system is interconnected—that is, through a direct connection to an end office or serving wire center. Id. at 27.

11. See, e.g., Department of Justice Response to Comments, November 23, 1982, at 62 n. **.

12. Nevertheless, these transmissions do not violate the prohibitions of the decree. See Competitive Impact Statement, February 10, 1982, at 30 n. 25. Within the existing technology, it is simply not possible to transmit radio signals which are strictly confined to geographic boundaries.

13. Several systems are so designed in order to achieve efficiencies from shared control facilities and to satisfy the needs of customers for broad service areas. Bell System Memorandum, May 9, 1983 at 6. For example, because of the economies of using a single central control facility for a large area, and because customers desire wide-area paging, Ohio Bell Telephone Company's paging systems currently in

stitute an "interexchange telecommunications service" which the Operating Companies may not offer under section II(D) absent Court approval. Hence this petition for an exception.

## II

The most important of the mobile radio services planned to be offered by the Operating Companies is cellular radio service.[14] Conventional mobile telephone systems—which cover large service areas with one or two high-powered transmitters located at prominent elevations—suffer from three defects: they cannot serve a large number of subscribers, their range is limited, and their technology limits the quality of voice transmissions. In contrast, cellular systems—which employ several moderately-powered transmitters centered in small, hexagonal-shaped geographic areas called "cells"—serve many more subscribers,[15] cover a wider service areas, and provide more consistent transmission quality.[16] It is predicted, moreover, that cellular radio will be far more affordable than conventional mobile telephone service.[17] With the petition presently before the Court, the Operating Companies seek permission[18] to build multi-LATA cellular radio systems in

operation are integrated to provide simultaneous paging in all transmitters located throughout either the northern or southern half of the entire state. Thus, there is a single transmitter in each LATA, but all of these transmitters are connected to a single central control facility which serves half of the state of Ohio. The mobile radio systems of competitors are similarly integrated to produce service areas which often extend across several LATAs. AT & T Response to Comments, November 23, 1982, at 28.

14. AT & T Memorandum, May 19, 1983, at 2. A few cellular radio systems are currently in operation on an experimental basis (see MCI Reply, May 19, 1983, at 5) and this service will be available to the public on a significant scale beginning in 1984.

Cellular radio technology was developed by Bell Laboratories beginning in 1947. See P. McGuigan, D. Conners, & K. Cannon, *Cellular Mobile Radio Telecommunications: Regulating an Emerging Industry,* 1983 Brigham Young Univ.L.Rev. at 309–11 (1983) [hereafter cited as 1983 Brigham Young Univ.L.Rev.]. The Bell System first proposed the implementation of the cellular concept for mobile radio services in 1969, and it filed a technical report in 1971 demonstrating the feasibility of cellular systems. AT & T Response, November 23, 1982, at 35. The FCC did not issue its final rules for the licensing of this service until 1982. See also note 18 *infra.*

15. While conventional mobile telephone systems allow only about 20 calls to be transmitted at any one time, the new cellular systems will permit thousands of calls to be transmitted simultaneously.

16. Cellular systems offer the potential for more consistent transmission quality than do conventional systems regardless of the terrain because the cellular design reduces the possibility that some parts of the service area will be in a "shadow zone" where reception is blocked. 1983 Brigham Young Univ.L.Rev. at 310 (1983).

17. The transmitters located in the numerous cells of a cellular radio system are linked by either wire or microwave transmission facilities to a central switching mechanism which is referred to as a Mobile Telecommunications Switching Office (MTSO). This central facility—which uses highly sophisticated computer applications to coordinate the several cells—is interconnected by landline telephone facilities to the wireline telephone network (Plan of Reorganization at 384), an arrangement which allows mobile callers to dial direct to almost anywhere in the world. 1983 Brigham Young Univ. L.Rev. at 310–12. A cellular system can serve many more subscribers than a conventional system because adjacent cells of a cellular system operate on different radio frequencies at relatively low power, thus enabling a greater number of callers to use the same finite radio frequency spectrum. The computer coordination provided by the MTSO allows the same frequencies to be "reused" by callers in non-adjacent cells. The MTSO also serves the function of automatically switching a mobile communication from one radio frequency to another when the mobile unit moves from one cell to another.

As a mobile phone moves from one cell to another, service potentially could be interrupted because adjacent cells are on different radio frequencies. To avoid this problem, however, the signal of the mobile unit is constantly monitored while the unit is in operation. As the unit moves from one cell into the next, the MTSO automatically reroutes the call through the appropriate transmitter. This process—known as "frequency hand off"—allows a mobile caller to drive through a cellular service area from one cell to another without any discernible impact on the conversation. *Id.* at 311.

18. An Operating Company will be able to offer cellular radio in a particular service area only if granted a license by the Federal Communica-

particular geographic areas to conform to FCC rulings.[19]

### III

As originally presented to the Court, the Operating Companies' petition was unclear as to the scope of the market they were seeking to enter; indeed, these companies appeared to seek the right to provide any and all mobile radio services without regard to LATA boundaries. This led the Department of Justice and several intervenors to oppose the petition. These opponents expressed particular concern that the Operating Companies would not only be permitted to combine several SMSAs into a single system but that, depending on new technology, they might be able to link distant metropolitan areas into one, expansive mobile radio system. See Department of

Justice Memorandum, May 19, 1983, at 4, 18. Under such circumstances, telephone users would have had the option of routing long distance calls over either the landline interexchange networks or over a mobile radio system, thus in effect overriding on a large scale the decree's limitations on the territorial reach of the Operating Companies. Such a development would have been entirely inconsistent with the terms and purposes of the decree, and the Court would not have authorized it.

Since that time, the original Operating Company petition has been—depending upon the point of view—either clarified or modified. The Operating Companies now request that they be permitted to construct and operate systems which have cells in more than one LATA in only nine specific geographic areas [20] each of them constitut-

---

tions Commission, which under the Communications Act determines the location of radio stations and establishes the areas to be served by those stations. 47 U.S.C. § 303(d), (h). The FCC has decided to license only two cellular systems per service area—one to be granted to the wireline carrier which provides local telephone service to the area (this will generally be a Bell Operating Company or a partnership venture between an Operating Company and an Independent Telephone Company) and the other to a non-wireline carrier (also known as a Radio Common Carrier or RCC). Half of the radio frequency set aside for cellular radio will be reserved for the wireline carrier, and the other half for the non-wireline carrier. In order to ensure fair competition between the two cellular systems, the FCC has decided to require the wireline carriers to express their willingness to interconnect any competing cellular system into the landline telephone network. *Public Mobile Radio Services; Cellular Communications Systems*, 47 Fed.Reg. at 10,028 (1982) (to be codified at 47 C.F.R. § 22,912(a)(9)); 1983 Brigham Young Univ.L.Rev. at 315–17.

19. In the case of cellular radio the FCC has established Standard Metropolitan Statistical Areas (SMSAs), or in some cases combinations of SMSAs, as the maximum areas to be served in initial applications by wireline carriers and Radio Common Carriers. In many instances, the LATA boundaries—which are also often based on SMSAs—will coincide with the FCC's service areas for cellular radio. In some areas, however, this will not be the case. For example, due to the significant vehicular traffic between New York City and its suburbs in surrounding states, the FCC has approved a "modified SMSA" for that region which is larger than

the New York LATA. Similarly, the Philadelphia modified SMSA established by the FCC for cellular radio purposes covers parts of the Philadelphia and Delaware Valley LATAs. See 47 C.F.R. § 22.903(e); Affidavit of Joseph Ambrozy, chief executive officer-designate for the Mid-Atlantic Region, cellular company, May 19, 1983, at 1. Further, the FCC has stated that it will entertain applications to enlarge the service areas it has prescribed by combining two or more SMSAs. See *Cellular Communications Systems*, 89 F.C.C.2d 58, 88–89 (1982). Applications to enlarge cellular service areas, such as in the Washington-Baltimore area, have already been submitted to and approved by the FCC. See Affidavit of Joseph Ambrozy, cellular company, at 2; *Washington Post*, August 27, 1983, at D8. See also note 21 *infra*.

20. These areas are: (1) New York; (2) Philadelphia; (3) Boston, Worcester, and Providence; (4) Baltimore and Washington; (5) Milwaukee, Racine, and Kenosha; (6) Memphis and West Memphis; (7) Cincinnati, Columbus, and Dayton; (8) Detroit and Toledo; and (9) Omaha and Western Iowa. See AT & T Memorandum, May 19, 1983, at 2–3. It may be noted that, as of AT & T's May 19, 1983 filing, the FCC had approved only two (New York and Philadelphia) of the nine consolidations. The Court agrees with the Operating Companies, however, that the issues presented by all nine of these areas are essentially the same, and it would be efficient to address all nine areas at this time. It appears that the FCC has approved other consolidations of cellular radio service areas since May 19, 1983. See *Washington Post*, August 27, 1983, at D8.

The Operating Companies initially also sought relief for two other areas: (1) Flint and Detroit;

ing one metropolitan complex.[21] The Court finds that, as so limited, the petition is meritorious, for the following reasons.

First. The LATA boundaries were drawn with reference to such factors as the existing arrangement of the landline telephone system, landline calling patterns, the location of toll switching centers, and the attractiveness of areas to interexchange carriers. See April 20, 1983 Opinion at 8–12. In contrast, the technological and competitive issues implicated by mobile radio services are, in some locations, significantly different. For example, while the existence of a high volume of daily automobile traffic across LATA boundaries was not a significant factor in the drawing of those boundaries (e.g., between New York and Northern New Jersey), it is of central importance to the design of cellular service areas, since subscribers will want and expect to be in communication with mobile units in this traffic which regularly crosses from one LATA to another.

It is clear that if the Operating Companies' cellular systems were in all instances restricted to LATA boundaries, their customers would be substantially inconvenienced. Under such a system, whenever a mobile unit crossed a LATA boundary, the communication between that unit and another mobile unit or a landline telephone would be suddenly disconnected, simply because the MTSO in one LATA could not serve cells in another LATA. After the disconnect, the customer would have to redial and reestablish contact through the MTSO for the "new" LATA—the one which the mobile unit had just entered. Indeed, a customer using a landline telephone might have to guess into which LATA the mobile unit had ventured, and he would therefore have to place more than one call to re-establish contact. If a mobile unit were travelling along a LATA border, repeated disconnections of this kind could occur.[22] None of this is at all practical.[23]

Second. If the Operating Companies were confined to LATAs in the areas for which an exception is being sought, one consequence would be a substantial loss in the economic efficiencies which could be produced by integrated, multi-LATA sys-

---

and (2) Seattle and Bellingham. The Court's final rulings on the LATAs has apparently obviated any need for relief in this regard. See Opinion of July 8, 1983 at 112–13.

**21.** There are also other areas in which the FCC's modified SMSAs extend, to a de minimus extent, beyond LATA boundaries; e.g., the Washington, D.C.. FCC-modified SMSA includes Loudon County, Virginia, which under the decree is located in the Culpeper LATA). Id. at 2 n. **. The Court will consider these areas to be included in the Operating Companies' petition presently before the Court.

**22.** Affidavit of William Weiss, chief executive officer-designate of the Midwest Region, May 27, 1983, at 4. It has also been pointed out that, because cellular mobile telephones are "locked onto" the strongest radio signal, regardless of the LATA of origin of the signal, there would inevitably be times when a call in one LATA near the border of the adjoining LATA would be picked up by a cell site in the adjoining LATA. If the customer then proceeded further into the LATA in which he was located, eventually a signal from a cell site in that LATA would become the strongest signal available to his telephone. The call would then be disconnected, even though the mobile unit had not even crossed a LATA boundary. Affidavit of Joseph

Ambrozy, at 5 n. 6. It also appears that, whenever contact would have to be reestablished, additional "roamer" charges would be incurred by the subscriber.

**23.** Several intervenors and the Department of Justice have proposed alternative mechanisms for dealing with the problems which result from confining cellular systems to LATA boundaries, but none of these appears to be practical.

Thus, it has been suggested that, whenever a mobile unit crosses a LATA boundary, the communication be switched to the facilities of an interexchange carrier. It appears, however, that this mechanism is not technically feasible. See AT & T Memorandum, May 19, 1983, at 10–11; Affidavit of Joseph Ambrozy at 4 n. 5; Affidavit of Morgan Kennedy at 7.

It has also been suggested that economies of scale produced by multi-LATA systems could be preserved by using one MTSO to serve two adjoining systems, as long as the MTSO blocked any inter-LATA communications. Department of Justice Memorandum, May 9, 1983, at 8 n *. Again, however, it appears that switching equipment does not exist which is capable of accomplishing this technological task. Affidavit of Morgan Kennedy at 10; Affidavit of Joseph Ambrozy at 3 n. 4. Simply put, each cellular system requires its own expensive MTSO.

tems. If, for example, the cellular system which is planned for the greater New York City area were limited by LATA boundaries, the Operating Companies would have to divide the system into two adjoining systems each to serve one LATA. Each cellular system would then need its own MTSO. The design changes in the New York area alone—along with the land that would have to be purchased for the second MTSO and the building constructed to house it—are estimated to increase the Operating Companies' costs by as much as $7.2 million.[24]

Third. The Operating Companies have already incurred considerable expense in anticipation of cellular radio service they had planned to offer even before the decree in this action was entered. Real estate has been purchased in some locations, and construction of central control facilities has begun. If the Operating Companies' cellular services were restricted by LATA boundaries, substantial costs would be in-

curred to re-engineer the planned systems and to reassign cell site locations.[25]

The major thrust of these considerations does not lie in the expense to the Operating Companies but in the significant competitive disadvantage to them were they strictly confined to LATA boundaries in all areas. That is so because the Radio Common Carriers will not be similarly restricted[26] and will be able to provide cellular service to areas as wide as the Federal Communications Commission will allow. The question that arises, then, is whether these significant disadvantages must be accepted in order to achieve the purposes of the decree in this case.

### IV

Under section VIII(C) of the decree, a line of business restriction, such as the one involving mobile radio services which cross LATA boundaries,[27] may be removed only "upon a showing . . . that there is no substantial possibility that [the petitioner]

---

**24.** Affidavit of Morgan Kennedy, chief executive officer-designate of the Northeast Region cellular company, May 19, 1983, at 13. See also Affidavit of Joseph Ambrozy at 3 (millions of dollars in additional costs to build two MTSOs for the Washington-Baltimore area). It is further predicted that if the Operating Companies' cellular systems had to be redesigned to conform to LATA boundaries, there would be a delay in the availability of service to the public of at least one year. Affidavit of Morgan Kennedy at 12; Affidavit of Joseph Ambrozy at 6.

**25.** Affidavit of Morgan Kennedy at 4 n. *, 10.

**26.** The Radio Common Carriers may construct or lease inter-LATA facilities to establish multi-LATA systems wherever they are granted the necessary license. This will give them economies of scale and the ability to provide wide-area service with a single call, and it will avoid the disconnection of communications and imposition of "roamer charges" on subscribers. Affidavit of William Weiss at 6; Affidavit of Joseph Ambrozy at 6; Comments of Juban Engineering, Inc., May 6, 1983, at 3.

**27.** In addition to the requested relief with respect to cellular radio discussed above, the Operating Companies seek limited permission to provide other mobile radio services across LATA boundaries in their customary mode.

At the present time, these companies offer one-way paging services in a number of locations with systems which often cover areas

which are larger than the LATAs established under the decree. See note 13 *supra*. They also provide other types of mobile radio services (such as conventional mobile telephone service, in which the central control facility serves transmitters in different LATAs, as well as several non-automated services (*e.g.*, Air-Ground, Coastal Harbor Maritime, and VHF Maritime). The latter, which are typically offered by the Operating Companies as a public service, often have transmitters located in one LATA, and an operator who serves the transmitters located, in a second LATA.

With respect to these services, it is asserted in support of the petition, in addition to the arguments discussed in Part III *supra*, that if the requested relief were not granted, many of the existing systems—which already have in operation transmitters in more than one LATA— would have to be dismantled, at considerable cost. See Affidavit of Jack MacAllister at 5. In addition to this one-time expense, there is claimed to be a loss of the efficiencies produced by the existence of one central control facility which serves transmitters in more than one LATA. Here again, it is said, the Operating Companies would be disadvantaged in the operation of existing mobile radio systems in comparison to their competitors, who will be able to benefit from the efficiencies produced by integrated, multi-LATA systems.

could use its monopoly power to impede competition in the market it seeks to enter." The various Operating Company interests expressed *supra* must, of course, be evaluated against that standard.

The effect on competition may be viewed from two aspects: (1) Operating Company competition vis-a-vis the interexchange carriers, and (2) Operating Company competition vis-a-vis the Radio Common Carriers in the mobile radio services market.

With respect to the first of these, the crux of the matter is that the mobile radio services for which relief is sought are not substitutes for landline inter-LATA facilities such that the Operating Companies would, to any significant degree, be competing with AT & T or any other interexchange carrier.[28] Indeed, AT & T itself supports the petition of the Operating Companies—which at this stage it would hardly do if the proposed mobile radio services were a serious threat to its own long distance network.

Only a limited number of inter-LATA communications are transmitted over conventional mobile radio systems.[29] With respect more specifically to cellular radio, most cellular calls in the nine areas for which exceptions are sought would still be intra-LATA in character, and the total number of inter-LATA cellular calls would be only a very small fraction of total inter-LATA communications in the area.[30]

In short, the mobile radio services at issue are either so fundamentally different from two-way landline service or are so much more limited and expensive that it is highly unlikely that Operating Company provision of these services across LATA boundaries in some selected areas could provide them with an incentive to fail in their obligation to provide equal access to interexchange carriers.[31] Thus, there does not appear to be ·a substantial possibility that the grant of the requested relief would impede competition in the interexchange market as a whole.

Somewhat different questions are presented with respect to competition in the mobile radio service market itself, but the result is no different. In this market, the Operating Companies will, of course, be competing with the Radio Common Carriers within the LATAs in any event, but if the requested relief is granted, they will

---

**28.** As noted above, the Operating Companies are not seeking the right to transport all communications which may *originate from or terminate* in a mobile unit. Indeed, it will not be the Operating Companies but the interexchange carriers which will carry inter-LATA calls between different mobile service areas or between mobile service areas and different LATAs. AT & T Memorandum, May 19, 1983, at 5 n. *. Thus, a call from a cellular subscriber in Philadelphia to New York City would be carried by the Operating Company only within the Philadelphia cellular service area. The communication would then be routed to the point of presence of an interexchange carrier (*e.g.*, AT & T, MCI, Sprint) which would carry the call to the New York City LATA. See AT & T Memorandum, May 19, 1983, at 5 n. *.

**29.** For instance, no conventional mobile telephone system of a wireline carrier is capable of handling more than 23 calls simultaneously— and only a fraction of these calls would be inter-LATA in character. Other conventional service, such as air-ground and coastal harbor maritime, are even more specialized and limited than conventional mobile telephone systems. Additionally, paging systems provide only one-way service—that is, the paging units receive

brief messages, such as "beeps," but do not send them—and they are therefore likewise not in *competition with the landline network.*

MCI has argued that the Operating Companies should be prohibited from providing paging services because these services are not analogous to local exchange service and do not represent a natural monopoly. MCI Reply, May 19, 1983, at 9.· But the previous Tunney Act proceedings have already *established that the Oper*ating Companies may offer paging services. See, *e.g.*, Competitive Impact Statement, February 10, 1982, at 30 n. 25.

**30.** See AT & T Memorandum, May 19, 1983, at 18; Affidavit of Joseph Ambrozy at 7. For example, while the Chicago SMSA serves about .3,700,000 main telephones, the Chicago cellular system, when fully deployed, will serve fewer than 50,000 mobile telephones. Affidavit ,of William Weiss at 2–3.

**31.** The Operating Companies have already been granted the right to carry inter-LATA traffic on a limited basis (*e.g.*, extended area service (EAS) and limited corridor traffic) in some of the same areas for which relief is requested by this petition.

extend this competition beyond LATA boundaries in some locations. On that basis, the Department of Justice and several intervenors have argued that this could create incentives for various types of anticompetitive conduct, particularly in the cellular radio field. While these concerns are not wholly without substance, they do not justify denial of the petition. Several of the objections can and will be satisfied by the imposition by the Court of conditions upon the grant of the petition. As for the broader policy objection, it is not, on balance, sufficiently well founded to outweigh other considerations. See Part V *infra.*

First. It has been argued that to allow the Operating Companies to offer inter-LATA mobile radio services would give them an incentive to discriminate against competing mobile radio systems with respect to interconnection.[32] Since the Operating Companies already have the right to provide mobile radio services within LATA boundaries, such an incentive may be said to exist already to some extent. The relatively limited expansion of areas across LATA boundaries in some locations would not appear to be a significant additional factor.[33] However, in order to alleviate any problems in that regard, the Court hereby requires as a condition of the grant of the petition that the Operating Companies offer to each non-wireline mobile radio licensee interconnection on the same terms and conditions as they provide to their own mobile radio systems.[34]

Second. The Department of Justice states that competing mobile radio service providers will be at a significant disadvantage if the Operating Companies do not impose an inter-LATA access charge on their own inter-LATA mobile radio services while collecting such charges from their radio service competitors.[35] That concern is legitimate, and in order to meet it, the Court hereby requires that the Operating Companies shall provide access to their own regional cellular corporations on the same terms—including price—as are offered to competing cellular systems.[36]

Third. It has been argued that the construction of inter-LATA landline facilities for mobile radio systems might, in the short term, be cross-subsidized from local monopoly services, and that such facilities might then interconnect with the local telephone network in a manner unavailable to the Radio Common Carriers.[37] The Operating Companies have stated that they intend, upon divestiture, to lease all inter-LATA facilities for their mobile radio systems from interexchange carriers on the

---

32. See, *e.g.,* MCI Reply, May 19, 1983, at 18.

33. The Department of Justice has stated:

> The Department generally agrees that permitting the BOCs to provide interexchange public radio services will not increase their opportunities or incentives to discriminate against providers of intra-LATA public radio services. Those incentives and opportunities derive from the ability to provide regulated monopoly exchange telecommunications services and potentially competitive public radio services jointly—an ability that is permitted by the Decree. Permitting an unlimited expansion of the geographic scope of such services, however, may place the BOCs in competition with other services and firms against whom the BOCs would not otherwise compete.

Department of Justice Response, May 9, 1983, at 6–7. This argument is not persuasive for two reasons. First, as noted above, the petition does not seek "unlimited expansion of the geographic scope of such services." Second, if the Operating Companies are allowed to cross LATA boundaries they will not thereby be placed in

competition with a new group of Radio Common Carriers. The Operating Companies will simply be able to compete with the same Radio Common Carriers to the extent permitted by the regulators.

34. Cellular radio will be provided by separate organizations established by the Regional Operating Companies.

35. Department of Justice Memorandum, May 19, 1983, at 10.

36. As concerns other mobile radio services, if the regional Operating Companies do not provide service through separate corporations, they shall, in their proposed rates, impute inter-LATA access charges to their systems' operations whenever their mobile radio system uses Operating Company exchange facilities under conditions in which a competing system would incur an inter-LATA access charge.

37. Department of Justice Memorandum, May 19, 1983, at 12–13.

same terms as are offered to their competitors.[38] This expectation, too, is hereby made a specific condition of the grant of the Operating Companies' petition.[39]

## V

The Department of Justice contends more broadly that the requested relief might give the Operating Companies the incentive and the ability to subsidize inter-LATA mobile radio services in the long term with monopoly revenues. While it may be true that, the larger the Operating Companies' mobile radio operations, the more opportunity there is theoretically for cross-subsidization, the Department itself recognizes that an Operating Company

> has existing incentives to cross-subsidize its cellular offerings with revenues derived from the provision of regulated monopoly exchange services, whether those public radio services are offered only within LATA boundaries, or on an inter-LATA basis as well.[40]

No persuasive reason has been given why the expansion of the Operating Companies' cellular service areas across LATA boundaries in nine locations would increase to any appreciable degree the ability and incentive of these companies to cross-subsidize.[41] To the extent that such a risk exists, it is substantially outweighed by the gains that will accrue to competition from the removal of the Operating Companies'

competitive [42] disadvantage vis-a-vis the Radio Common Carriers, who are not confined by the LATAs. Even though the grant of the petition would directly affect only a small fraction of all inter-LATA communications in any particular area, its denial would greatly reduce the Operating Companies' profits from mobile radio services, for the Operating Companies' systems in their entirety might then be unable to compete effectively with the Radio Common Carriers' systems. Such a disadvantage would, of course, tend to reduce the profits of the Operating Companies' mobile radio services—profits which could otherwise contribute to their financial strength. It would follow that projections of return on investment might not be commensurate with the risk involved, and this, in turn, might lead the Operating Companies to cancel altogether their plans to provide cellular radio, at least with respect to some areas.

It must finally be remembered that the petition before the Court would not involve the Operating Companies in a business venture in an unrelated field, for these companies are already legitimately in the mobile radio service business. Under the petition, they will simply be allowed to enlarge on that business, with safeguards imposed by the Court to eliminate any risks to competition.

As in the past, the Court's approach to the issues is being dictated by pragmatic

---

**38.** See AT & T Memorandum, May 19, 1983, at 14 n. *; Affidavit of Morgan Kennedy at 15; Affidavit of Joseph Ambrozy at 8.

Inter-LATA facilities now owned by the Operating Companies which are used to connect central control facilities with the telephone network or to provide the trunking that links remote transmitters, will be transferred to AT & T at the time of divestiture, because such facilities are an integral part of packets of circuits used predominantly for inter-LATA transmissions. See AT & T Response to Comments, November 23, 1982, at 33.

**39.** The Operating Companies may, of course, seek permission at a later date to construct their own inter-LATA transmission facilities for their mobile radio systems.

**40.** Department of Justice Memorandum, May 9, 1983, at 8.

**41.** The Department of Justice states that

to the extent that cellular service is subject to a regulatory rate of return constraint, [an Operating Company] may have an incentive to cross-subsidize its interexchange cellular offerings with intraexchange cellular revenues.

*Id.* at 8–9. While this scenario seems possible in theory, it is unlikely that an Operating Company would attempt to cross-subsidize from one competitive market to another. See note 42 *infra*.

**42.** Mobile radio markets have, in general, been highly competitive. See Comments of the New York State Department of Public Service, May 16, 1983, at 2; AT & T Memorandum, May 9, 1983, at 3.

rather than ideological considerations. Where, as here, there is, realistically, no danger that the relief would harm competition, the Court will not deny it merely because abstractly the activities may be classified as being in the competitive rather than in the monopoly area. At the same time the Court will, of course, vigilantly enforce the provisions of sections II(D) and VIII(C), and where there is no showing that "there is no substantial possibility" that the Operating Companies could use their monopoly power to impede competition— whether by means of cross-subsidization or otherwise—they will be precluded from entering the relevant markets.

The Operating Companies' petition pursuant to Section VIII(C) is hereby granted, subject to the three restrictions described at pp. 651–652 *supra*.[43]

---

**43.** To the extent that the Operating Companies request that in addition to being allowed to operate in their customary mode existing mobile systems other than cellular radio, they also be granted authority to establish additional "comparably sized wide area [paging] systems in other areas" (see AT & T Memorandum, May 19, 1983, at 4), the petition is denied. This request is vague, and the need for the relief has not been demonstrated.