TO BE PUBLISHED IN THE OFFICIAL REPORTS

ATTORNEY GENERAL'S OPINION

Opinion No. 94-209

**February 9, 1994**

Requested by: PUBLIC UTILITIES COMMISSION

Opinion by: DANIEL E. LUNGREN, Attorney General
David Stirling, Chief Deputy Attorney
General
Roderick E. Walston, Chief Assistant
Attorney General
Thomas Greene, Assistant Attorney
General
Thomas P. Dove, Supervising Deputy
Attorney General
Lindsay Bower, Deputy Attorney General

THE PUBLIC UTILITIES COMMISSION has requested an advisory opinion, pursuant to Public Utilities Code section 854, on the competitive effects of the proposed acquisition of McCaw Cellular Communications, Inc. by American Telephone and Telegraph.

## CONCLUSIONS

(1) The proposed acquisition should not by itself adversely affect competition in the markets for telephone long distance or cellular local or regional services.

(2) The potential benefits to the public of the merger would be enhanced if the Bell Operating Companies were permitted to provide cellular long distance services in competition with the merged entity.

Accordingly, we have concluded that the acquisition will not adversely affect competition within the meaning of section 854(b)(2).

*OUTLINE OF ANALYSIS*

*PAGE*

| | | |
|---|---|---|
| *INTRODUCTION* | | *1* |
| *I.* | *PRIOR PROCEEDINGS AND THE NATURE OF THIS OPINION* | *3* |
| | *A. Prior Proceedings* | *3* |
| | *B. This Advisory Opinion* | *4* |
| | *C. Evidentiary Basis of This Opinion* | *5* |
| *II.* | *THE MERGER* | *5* |
| | *A. AT&T and McCaw Long Distance Telephone Sevices* | *7* |
| | *B. McCaw Local Cellular Services* | *11* |
| | *C. Regional Cellular and Cellular Long Distance Services* | *12* |
| | *D. AT&T Wireless Equipment Manufacturing* | *15* |
| *III.* | *THE RELEVANT MARKETS* | *16* |
| | *A. The Relevant Interexchange Service Markets* | *18* |
| | *B. The Relevant Markets for Local Cellular Services* | *19* |
| | *C. The Relevant Markets for Regional Cellular Services* | *20* |
| *IV.* | *THE MFJ, REGIONAL CELLULAR COMPETITION, AND CELLULAR BYPASS* | *23* |
| *V.* | *THE NATURE AND COMPETITIVE EFFECTS OF THE MERGER* | *30* |
| | *A. The Vertical Integration of McCaw Cellular and AT&T Long Distance Operations* | *31* |
| | *1. The Efficiencies* | *32* |
| | *2. The Merger, the MFJ, and Barriers to Entry* | *35* |
| | *3. AT&T Opposition to the Generic Wireless Motion and the Noerr Pennington Doctrine* | *37* |
| | *B. The Horizontal Consolidation of the Long Distance Operations* | *38* |
| | *C. AT&T as a Potential Competitor in the Relevant Markets for Cellular Services* | *40* |
| *VI.* | *CONCLUSION* | *41* |

## *INTRODUCTION*

*Pursuant to Public Utilities Code section 854, the American Telephone and Telegraph Corporation ("AT&T"), Ridge Merger Corporation ("Ridge"), and McCaw Cellular Communications, Inc. ("McCaw") have applied for authorization from the California Public Utilities Commission ("PUC" or "Commission") to transfer to AT&T indirect control of certain telecommunications utilities currently owned by McCaw. On November 30, 1993, the PUC requested that this office render an opinion on the "effects this proposed merger could have on competition." This memorandum is submitted in response to that request.*

*Various federal and state agencies are also reviewing the merger, which the applicants hope to culminate before the May 1994 auction of PCS licenses by the Federal Communications Commission ("FCC"). The merger has been contested both in California and at the federal level. The Division of Ratepayer Advocates ("DRA"), Pacific Telesis Group and its affiliates ("Pacific Telesis" or "PacTel"), the Cellular Reseller Association and other groups protested the merger in the instant proceedings on competitive and other grounds. As of this date, the applicants have successfully settled with all of the California protestants, except for Pacific Telesis and the Cellular Agents Association.*

*In parallel proceedings before the District Court and the FCC, Pacific Telesis and the other Bell Operating Companies challenged the merger primarily on the grounds that the merged entity would be able to provide "clustered," cellular long distance, and other integrated services more economically than the Bell Operating Company ("BOC") cellular affiliates.[1] AT&T is the leading supplier of long distance telephone services and one of the largest manufacturers of wireless network equipment in the United States, while McCaw is the nation's largest provider of cellular services. Competition between AT&T and McCaw is not significant, and the services and operations of the two companies are highly complementary. Thus, AT&T long distance facilities, its network expertise, and equipment manufacturing operations will significantly enhance the ability of the cellular operation to provide cellular services. For that reason, the BOCs have proposed that conditions be imposed upon AT&T to ensure competitive parity between the parties.[2]*

*We conclude that the benefits to the public of this merger will depend upon the extent to which the consolidated entity will be subjected to competition. The merger of AT&T long distance operations with McCaw will not by itself adversely affect competition within this state. However, competition for cellular services within regional markets encompassing California -- which the merged*

---

*1. BellSouth Corporation has also moved the District Court for a declaratory ruling that the merger would violate Section I(D) of the MFJ and cannot be consummated without a modification of that decree. Motion of BellSouth Corporation for a Declaratory Ruling that AT&T's Proposed Acquisition of McCaw Cellular Communications, Inc. Would Violate Section I(D) of the AT&T Consent Decree and Cannot Be Consummated without a Modification of the Decree, United States v. Western Elec. Co., No. 82-0192 HHG (D.D.C. Dec. 2, 1993). DOJ supports the BellSouth motion. See Response of the United States to Motion of BellSouth for a Declaratory Ruling, United States v. Western Elec. Co., No. 82-0192 HHG (D.D.C. Jan. 5, 1994).*

*2. See Affidavit of John T. Stupka, attached to Petition of Southwestern Bell Corporation to Impose Conditions or, in the Alternative, to Deny, In re American Telephone and Telegraph and Craig O. McCaw, No. ENF 93-44 (F.C.C. Oct. 28, 1993) ("Stupka Affidavit").*

*entity is clearly designed to serve -- would be enhanced if the BOCs were permitted to provide long distance services to their wireless customers. Accordingly, we recommend that the PUC support the pending petition of the BOCs before DOJ to lift wireless services from the restrictions of Section II of the Modified Final Judgment ("MFJ"[3]). Finally, we understand that the United States Department of Justice is reviewing the effect of the merger of the AT&T wireless equipment division with McCaw and we defer to the judgment of that agency on that national issue.*

## I.     *PRIOR PROCEEDINGS AND THE NATURE OF THIS OPINION*

### A.     *Prior Proceedings*

*Like the recently completed merger between GTE and Contel, this transaction is to be accomplished by merging Ridge, a wholly-owned subsidiary of AT&T, with and into McCaw. Upon completion of the merger, Ridge will cease to exist as an independent entity, control of McCaw will transfer from Craig McCaw to AT&T, and McCaw will become a wholly-owned subsidiary of AT&T. The merger will also indirectly transfer control of various California utilities currently owned or controlled by McCaw.*

*Although they view this acquisition as a mere "transfer of indirect control" of McCaw's operations, and not as an acquisition of or by a public utility within the meaning of California Public Utilities Code section 854,[4] the applicants submitted the transaction to PUC review under the criteria set forth in that provision.[5] Under the terms of the settlement agreement entered into with DRA on December 8, 1993,[6] AT&T also agreed to provide "equal access" to all customers within six months*

---

*3. U.S. v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C. 1982), aff'd. sub nom Maryland v. United States, 460 U.S. 1001 (1983).*

*4. Thus, the applicants contend that, "It is far from clear whether subsections (b) and (c) of section 854 are triggered by the proposed transaction since it involves no utility making an acquisition and no utility is being acquired." Applicants' Pre-Hearing Conference Statement at 11 n. 10, In re Joint Application of the American Telephone and Telegraph Company, et al. (P.U.C., October 6, 1993).*

*5. See Settlement Agreement at 3, In re Joint Application of the American Telephone and Telegraph Company, et al., (P.U.C. Dec. 8, 1993) ("The implementation of this Agreement is contingent upon final and complete approval of the Transaction under Section 854 by the Commission and consummation of the Transaction by the applicants."). See also Transcript at 28-40, In re Joint Application of the American Telephone and Telegraph Company, et al., (P.U.C. Nov. 8, 1993).*

*6. Settlement Agreement, In re Joint Application of the American Telephone and Telegraph Company, et al., (P.U.C. Dec. 8, 1993) ("Settlement Agreement").*

of the effective date of the merger,[7] to treat McCaw as a separate entity for two years, and to comply with existing restrictions on the "bundling" of long distance and cellular services and products.[8] The Cellular Reseller Association and Public Advocates subsequently joined the agreement, which Pacific Telesis and the Cellular Agents Association have opposed. The applicants now contend there is no material issue of fact warranting a hearing and request that the Commission adopt the settlement agreement in its current form. The United States Department of Justice ("DOJ"), the FCC, and Judge Harold Greene (who presided over the divestiture of AT&T) have not completed their review of this transaction.

### B.    *This Advisory Opinion*

This opinion letter is the fourth letter submitted by this office under the 1989 amendments to Section 854.[9] Public Utility Code section 854 characterizes the opinion as advisory. Consequently this document does not control the PUC's finding under section 854, subdivision (b)(2). However, the Attorney General's advice is entitled to the weight commonly accorded an Attorney General's opinion (*see, e.g., Moore v. Panish* (1982) 32 Cal.3d 535, 544 ("*Attorney General opinions are generally accorded 3 great weight*"); *Farron v. City and County of San Francisco,* (1989) 216 Cal.App.3d 1071).

### C.    *Evidentiary Basis of This Opinion*

The opinion we reach here is based upon substantial evidence, although we obviously do not have access to the full record that will be ultimately developed during the PUC's hearings. As requested, we render this opinion before commencement of those hearings. During the course of our review, we held numerous discussions with the parties and PUC staff and obtained substantial materials from them pertaining to the issues discussed. Additional conversations were held with other members of the industry and with staff of other regulatory and governmental agencies. We have also relied upon an industry expert, Mr. Charles P. Mason, to obtain further background information and an understanding of the workings of the industry.

## II.    *THE MERGER*

---

7.  PacTel contends that "AT&T's equal access commitment is . . . hollow" and "is not the same as the BOCs' equal access obligations." *Comments on the Proposed Settlement between Applicants AT&T and McCaw and the Division of Ratepayer Advocates, In re Joint Application of the American Telephone and Telegraph Company et al.,* at 8, 10 (P.U.C., Jan. 3, 1994).

8.  In its *Comments,* PacTel argued that: "[I]n many circumstances bundling is pro-consumer. But in the context of this merger . . ., bundling by AT&T/MCCI before full competition could be harmful to consumers." *Id.* at 13.

9.  See *Opinion of the Attorney General on Competitive Effects of Proposed Merger of GTE and Contel Corporations, Submitted Pursuant to PU Code Section 854(b)(2); Opinion of the Attorney General on the Proposed Acquisition of San Diego Gas and Electric Company by SCEcorp, the Parent of Southern California Edison Co.,* 73 Cal.Ops.Atty.Gen. 366 (1990).

*This merger is motivated by the applicants' hope to combine AT&T's long distance telephone network, expertise and capital with McCaw's existing cellular system.[10] AT&T businesses are concentrated in five groups,[11] but the "core" of the company's business is still related to its long distance operations. In 1992, AT&T generated revenues of $40 billion from sales of long distance services. The company is also a leading equipment manufacturer, with $8 billion in 1992 sales coming from telecommunications network products and $3 billion from computer products.*

*McCaw, which resells AT&T long distance services to its cellular customers and purchases much of its equipment from AT&T, is already the leading operator of conventional local and regional cellular services in the United States. See Application, supra, at 6. The company also owns various broadcast operations and is a significant provider of other wireless services, such as paging,[12] air-to-ground, and satellite communications.[13] In 1992, McCaw revenues exceeded $1.7 billion and company debt totalled approximately $5 billion.[14] The financial and operational synergies[15] between the AT&T and McCaw operations will allow the surviving entity to create the country's leading national cellular system.*

*Both companies do a substantial amount of business in California, although neither of the parent corporations is regulated as a public utility in this state.[16] AT&T provides telecommunications services in California through a regulated subsidiary, AT&T Communications of California, Inc. Additional California revenues are generated through AT&T's unregulated operations. Application, supra, at 5.*

*McCaw affiliates which provide local cellular services and which are California public utilities include Alpine CA-3, Cagal Cellular Communications Corp., Fresno Cellular Telephone*

---

*10. See Application at 21, In re Joint Application of the American Telephone and Telegraph Company et al. (P.U.C., Aug. 24, 1993) ("Application"); AT&T's and McCaw's Opposition to Petitions to Deny and Reply to Comments at 39, In re American Telephone and Telegraph Co. and McCaw Cellular Communications, Inc., ENF 93-44 (F.C.C. Dec. 2, 1993) ("AT&T FCC Opposition").*

*11. See Application, supra, at 5.*

*12. McCaw is the fifth largest paging service in the United States with over 500,000 subscribers throughout the country. Affidavit of James L. Barksdale at ¶11, attached to AT&T FCC Opposition, supra ("Barksdale Affidavit").*

*13. See Petition of Southwestern Bell Corporation to Impose Conditions or, in the Alternative, to Deny at 12, In re American Telephone and Telegraph and Craig O. McCaw, No. ENF 93-44 (F.C.C. Oct. 28, 1993) ("Southwestern Bell Petition").*

*14. See Barksdale Affidavit, supra, at ¶ 13.*

*15. See Barksdale Affidavit, supra, at ¶¶ 24-26.*

*16. Applicants' Pre-Hearing Conference Statement, supra, at 2, n. 1.*

*Company, Napa Cellular Telephone Company, Redding Cellular Telephone Company, Sacramento Cellular Telephone Company, Salinas Cellular Telephone Company, Santa Barbara Cellular Systems, Inc., Stockton Cellular Telephone Company, and Ventura Cellular Telephone Company. McCaw has combined all of these franchises in its "California/Nevada cluster." McCaw also has substantial indirect interests in Bay Area Cellular Telephone Company and Los Angeles Cellular Telephone Company. McCaw affiliates authorized to resell long distance services, including resale to cellular providers, include California Intercall and Cellular Long Distance Co. In addition, Airsignal of California, Inc. is authorized to operate radio telephone utility systems in various parts of this state.*

### A.    *AT&T and McCaw Long Distance Telephone Services*

*Both AT&T and, to a relatively limited extent, McCaw offer long distance services to their customers. AT&T is unquestionably the leading provider of long distance services routed over landline facilities in the United States. However, much of the long distance services McCaw provides are actually purchased in "bulk" from AT&T and other long distance carriers and "resold" to cellular customers. McCaw also completes over its own network a significant portion of the long distance calls which are placed within integrated clusters of McCaw operations. See Southwestern Bell Petition, supra, at 24.*

*Long distance telephone services include both "interLATA"[17] and "intraLATA" communications, as those terms were defined under the MFJ.[18] For most conventional landline calls, the local telephone companies, or "local exchange carriers" ("LECs"),[19] provide the wires or the "local*

---

*17. "LATA" is an acronym for "Local Access and Transport Area." U.S. v. Western Electric Co., Inc., 569 F.Supp. 990, 993 n. 9 (D.D.C.1983) (the "LATA" Decision")].*

*18. Under the consent decrees, the traffic between LATAs (the "interLATA traffic") became the province of the interexchange carriers (IECs), such as AT&T, Sprint, and MCI. LATA Decision, supra, 569 F.Supp. at 994. The IECs were also allowed to carry intraLATA communications in competition with the LECs, subject to state regulations and the local company's exclusive franchise within its service area. LATA Decision, supra, 569 F.Supp. at 994 n.16.*

*19. The LEC nomenclature is somewhat confusing because of the AT&T and GTE consent decrees, which completely redrew the areas in which different types of telephone companies were allowed to operate. The traditionally exclusive right of local telephone companies to provide service for calls which originate and end within their service territories was unchanged. However, the LECs owned by the Bell Operating Companies ("BOCs") and the General Telephone Operating Companies ("GTOCs") were prohibited from carrying telephone traffic out of judicially-defined "exchange" areas, or LATAs ["LATA" is an acronym for "Local Access and Transport Area." LATA Decision, supra, 569 F.Supp. at 993 n.9] which subsumed the local companies' service areas. The D.C. Circuit recently refused to remove this restriction. U.S. v. Western Electric Co., 900 F.2d 283, 300 (D.C.Cir.) ("Triennial Review Decision"), cert. denied, 111 S.Ct. 283 (1990).*

*loop"[20] that physically connect users to each other and to long distance carriers.[21]  Interexchange carriers ("IECs"), such as AT&T, transport telecommunications between a point in one Local Access and Transport Area ("LATA" or "exchange area") and a point located in another exchange area.[22]*

---

   *20.  A call is "local" if it is placed within the area in which flat-rate subscribers may call at no extra charge.  In California, this area usually includes the exchange to which the subscriber's line is directly connected (the "end office"), contiguous exchanges, and other exchanges within 12 miles of the subscriber's end office.  All remaining calls -- both intra- and interLATA -- between exchanges, except for Zone Usage Measurement ("ZUM") and Extended Area Services ("EAS"), are "toll" services.  California Pubic Utilities Commission Division of Ratepayer Advocates, Report on Policy and Technical Issues in I. 87-11-033, Phase III, at 3-4 (Feb. 8, 1991) ("1991 DRA Policy Report").  Neither consent decree directly affected these types of services.  As Judge Greene noted in his "LATA" opinion:*

>   *calls placed within any one LATA may still be either "local" or "toll" depending upon the requirements or rates established by state regulators.  Neither the LATAs nor the decree in this case changes that situation in any way.*

*LATA Decision, supra, at 995.*

   *21.  Pacific Bell and other local exchange carriers charge interexchange carriers for making available their facilities in the placement, transport and termination of interLATA calls.  See Dingwall, Imputation of Access Charges -- A Prerequisite for Effective IntraLATA Toll Competition, 40 Administrative Law Review 433, 435 (1988) at 434 n.4.  These fees represent a substantial portion of the revenues generated by local exchange companies.*

 *Although LECs use the same type of access facilities to complete both intraLATA and interLATA calls, Dingwall, supra, at 435, they did not until recently charge direct fees for access and network facilities employed in the placement of intraLATA toll calls.  Instead, they shared toll revenues through "settlement" arrangements with other LECs in their various LATAs.  1991 DRA Policy Report, supra, at 2A-7-2A-9.*

 *Local exchange carriers also provide the local switching facilities that direct calls to a local party or the long distance carrier, depending upon the number dialed.*

 *IntraLATA services are long distance calls (which are functionally equivalent to interLATA toll services.  See Huber, The Geodesic Network: 1987 Report on Competition in the Telephone Industry, at 3.1 ("Geodesic Network I").) that can be completed by local carriers.  Thus, in most instances, toll calls within the same area code require intraLATA toll services.  IntraLATA toll services are a major revenue source for most local exchange companies.  Huber estimated that, on a nationwide basis, intraLATA services accounted for one-third, or $20 billion, of all toll revenues.  Geodesic Network I, supra, at 3.15.*

*In 1987, Peter Huber prepared Geodesic Network I for the Justice Department's "First Triennial Review" of the MFJ.  See U.S. v. Western Electric Co., 673 F.Supp. 525, 528 n. 1, 537 n. 44 (D.D.C. 1987)("First Triennial Decision"), rev'd on other grounds, 900 F.2d 283 ("Triennial*

*Although the consent decrees permitted the BOCs, as well as the IECs, to provide intraLATA services,[23] in some states, including California, LECs are the only carriers that are explicitly permitted to complete all types of intraLATA calls.  The AT&T consent decree does prohibit Pacific Bell and the other Bell Operating Companies ("BOCs") from providing interexchange services.[24]  However, as we discuss below, cellular long distance telephone calls, such as those provided by McCaw, are usually routed outside the public switched telephone network ("PSTN") of the LECs.*

*In 1992, AT&T generated revenues of $40 billion and earned $2.3 billion net of taxes[25] from its long distance operations.  Although McCaw does not separately report its national cellular long distance revenues, it appears unlikely that its 1992 cellular long distance revenues exceeded $100 million.[26]  In California, McCaw provided cellular interexchange services through California Intercall and Cellular Long Distance Company.  Annual revenues generated by those two operations were approximately $18 million as of June 1993.[27]*

### B.    *McCaw Local Cellular Services*

*Review Decision"), cert. denied, 111 S.Ct. 283 (1990).  Huber published a follow-up report in 1993:  Huber, Kellogg, Thome, The Geodesic Network II:  1993 Report on Competition in the Telephone Industry ("Geodesic Network II").*

*23.  See  U.S. v. Western Electric Co., 569 F.Supp. 1057, 1108 (D.D.C. 1983) (The "Reorganization Decision").*

*24.  For several years after the issuance of the MFJ, it was necessary to dial an access code ("10XXX") if a subscriber wished to place a call through an AT&T competitor.  By "presubscribing" to competitive services, users can now access an IEC by dialing "1 plus" the area code of the receiving area exchange.*

*25.  Hall, Long Distance:  Public Benefits from Increased Competition at 21 (Oct. 1993).*

*26.  Economists retained by the BOCs estimated that annual cellular long distance charges as of December 1991 were $771 million.  Affidavit of Richard S. Higgins and James C. Miller III at 12 n. 30,  attached to Reply of the Bell Companies in Support of Their Motion for Removal of Mobile and other Wireless Services from the Scope of the Interexchange Restriction and Equal Access Requirement of Section II of the Decree, United States v. Western Elec. Co., No. 82-0192 (D.D.C. Aug. 3, 1992) ("Higgins and Miller Affidavit").  According to another study, McCaw serves twelve percent of the population in the "top 90" MSA markets.  See Geodesic Network II, supra at 4.25.*

*27.  See Exhibits M and N attached to Application, supra.*

*Formed only ten years ago, McCaw has pursued an aggressive acquisition strategy[28] to become the largest cellular company[29] in the United States[30] and the second largest provider in California.[31] McCaw provides local cellular services through exclusive FCC-granted "duopoly" franchises[32] in 83 metropolitan service areas ("MSAs") and 4 rural service areas ("RSAs") located throughout the United States.[33] Between 60 and 100 million people now live in areas served by*

---

28. *McCaw Cellular Communications, Inc., 1992 Annual Report, at 4. Between 1986 and 1990, McCaw purchased cellular holdings from the following companies: Charisma Communication Corp. and Maxcell Telecom Plus, Inc. (Dec. 1986-Jan. 1987, $255 million); MCI Cellular Telephone Company (July 1986, $122 million); First Cellular Group (Nov. 1987, $55 million); Post Cellular Telecommunications (Jan. 1988, $245 million); Lin Broadcasting (March 1990, $3.375 billion). Memorandum from B. Davis, Overview, at Bates No. 001752 (Sept. 6, 1990). Through the Lin acquisition, McCaw acquired a controlling interest "a company with cellular interests in New York -- the most important telecommunications marketplace in the world -- Los Angeles, Philadelphia, Dallas and Houston." McCaw Cellular Communications, Inc., 1992 Annual Report, at 6 ("1992 McCaw Annual Report").*

29. *Cellular radio is a mobile telephone service supported by numerous "cells" in designated franchise areas. A low-power transmitter within each cell connects users to a mobile telephone switch office ("MTSO"). The MTSO, which coordinates overall operations, is in turn connected to the local exchange carrier.*

30. *Statistics for populations served by cellular companies (a common measure of the value of cellular holdings) show that, on an aggregate basis, McCaw is the largest provider of cellular services in the United States.*

31. *In 1991, the major California cellular carriers had access to the following percentages of State POPs: PacTel Cellular, 64; BellSouth, 30; McCaw, 24; GTEM, 21; LIN Broadcasting, 19; Contel Cellular, 15; US WEST NewVector, 9; US Cellular Corp., 3; Citizens Utility, 2; General Cellular, 1. Paul Kagan Associates, Inc., 1991 The Cellular Telephone Atlas at 17 (1991). Note that because there are two providers in every service area, the total number of POP percentages in a region will be 200.*

32. *In 1981, the FCC established the current network of two cellular systems in metropolitan service areas ("MSAs") and rural service areas ("RSAs") located throughout the United States. The FCC reserved one of the licenses for the local telephone company or an affiliate (the "Block B carrier") and made the other franchise available to any entity which did not provide local telephone service in that area (the "Block A carrier"). In California, carriers must also sell service at wholesale rates to "resellers" which compete in the retail market. See Geodesic Network II, supra, at 4.15.*

33. *See Paul Kagan Associates, Inc., 1992 The Cellular Telephone Atlas (1992). See also Geodesic Network II, supra, at Table 4.6.*

*McCaw affiliates.[34]  In California, McCaw affiliates control or share control over 15 MSA and 2 RSA franchises.  The merger will not affect the number of cellular subscribers served by McCaw affiliates.*

*C.        Regional Cellular and Cellular Long Distance Services*

*Following the lead of the paging industry,[35] providers of cellular services are expanding the geographical scope of their coverage outside individual service areas by consolidating and "clustering" contiguous service areas and entering into regional alliances with other providers.[36]  From a series of acquisitions, McCaw has already developed eight regional cellular clusters,[37] "bringing it closest to `national' services provider status."[38]  The largest of these eight groups is the California/Nevada cluster, which includes the Los Angeles, San Francisco, San Jose, Las Vegas and Reno service areas.[39]  Believing that "[t]hese regional consolidations and coalitions are what create the most desirable service for customers,"[40] the company is now "in the process of linking those regional cellular systems into a `national seamless network' permitting the company's subscribers, without making special arrangements, to both place and receive calls anywhere they travel . . ."[41]  The result is the North American Cellular Network ("NACN").[42]*

---

*34.  Bell Operating Companies, Report of the Bell Companies on Competition in Wireless Telecommunications Services, 1991, at 29 (October 31, 1991).*

*35.  See Geodesic Network II, supra, at 4.61, 4.66.*

*36.  "No major player believes that it can long continue to operate mobile services island by island; all are aiming to build up seamless, nationwide service by direct acquisition, by reselling other companies' services, or by developing technology that will make corporate (and therefore geographic) lines essentially invisible to the consumer."  Geodesic Network II, supra, at 4.65.*

37.  McCaw Cellular Communications, Inc., *Securities and Exchange Commission Form 10-K* at 5-8 (March 23, 1993) ("*1993 McCaw 10-K*").  *See Geodesic Network II*, *supra*, Table 4.11, at 4.68.

38.  Memorandum from L. Chakrin to V. Palson, A. Stark, B. Davis, at Bates No. A100764 (Dec. 7, 1990).

39.  *1993 McCaw 10-K*, *supra*, at 6.

40.  McCaw Cellular Communications, Inc., *Cellular Communications:  A Vision of the Future*, 6 (Oct. 20, 1989), *quoted in Geodesic Network II*, *supra*, at 4.66.

41.  *1993 McCaw 10-K*, *supra*, at 1.

42.  *1993 McCaw Annual Report*, *supra*, at 6.  According to McCaw, the NACN "provides nationwide seamless service to users in any participating system.  NACN is a major step in the evolution of cellular as a true mobile service, unconstrained by inflexible notions of `local' and `long distance' communications.  Through NACN, subscribers receive automatic roaming privileges and the same feature set and dialing plan they enjoy in their home system."  *Opposition*

*As McCaw and other clusters grow, long distance routing issues become increasingly important. For long distance traffic placed outside clusters, cellular providers must decide whether to route the calls between the cellular switch (the MTSO) and the long distance carrier's Point of Presence ("POP") over the local telephone company's switched network or over a "dedicated" line. Traffic routed over dedicated lines -- regardless of whether the lines are owned by LECs, CAPs, or IECs -- are said to "bypass" the switched network (i.e., the PSTN).[43] McCaw and other non-BOC cellular providers, which are not subject to the interexchange restrictions of the MFJ, also typically provide to customers a single interexchange carrier's long distance services, which the cellular provider obtains at wholesale "bulk" rates.[44]*

*For long distance traffic placed within a (multi-LATA) cluster, non-BOCs have the additional option of routing the calls over their cellular switched network to the MTSO nearest the destination end office,[45] thereby avoiding the costs of both access and interexchange services.[46] Thus, in McCaw's highly publicized "City of Florida" cluster (which encompasses most of the state of Florida), all calls are considered "local" and are billed at a flat rate[47] which is often less than the cost of placing the calls over the landline system. As a result of the merger, McCaw will be able to route its calls over AT&T's vast telephone system and to use AT&T network expertise to determine optimum routing patterns, in many instances avoiding LEC facilities entirely.*

---

*of McCaw Cellular Communications, Inc. at 2, In re Policies and Rules Pertaining to the Equal Access Obligations of Cellular Licensees*, No. RM-8012 (F.C.C. Sept. 2, 1992) ("*McCaw Equal Access Opposition*").

43. A fundamental dispute between the BOCs and AT&T is whether the cost to a CAP or other non-LEC of installing bypass facilities to the MTSO is prohibitively expensive, thereby providing LECs with a "cellular bottleneck" in the vast majority of cases. *See* discussion in Section V, *infra*.

44. "If the call is placed to a destination outside the wide-area plan, it will generally be handed off to an IXC selected by the cellular carrier. In such cases, the cellular carrier often has an agreement with a particular IXC to obtain bulk service at volume-discounted rates." *McCaw Equal Access Opposition*, *supra*, at 14.

45. *See McCaw Equal Access Opposition*, *supra*, at 17.

46. *See Southwestern Bell Petition*, *supra*, at 24, 25 ("In some instances, McCaw uses microwave to link cell sites to mobile switches. The company also uses longer microwave shots to link clusters and switches. In California, for example, McCaw operates more than 50 microwave facilities linking areas 20 or more miles apart. For example, it links Mt. Pass with Yermo, nearly 80 miles away. It also provides service between Stockton and Elk Grove, a distance of 50 miles"); *McCaw Equal Access Opposition*, *supra*, at 13; *Affidavit of Steven C. Salop and Franklin M. Fisher*, attached to *Southwestern Bell Petition*, *supra*, at 27-32 ("Salop and Fisher Affidavit"); *AT&T FCC Opposition*, *supra*, at 49.

47. An internal AT&T document notes that, "'City of Florida' Plan Offers InterLATA Service without Using an Interexchange Carrier." Memorandum from E. El Hamamsy, G. Maddaloni, S. Prysant, at Bates No. A000521 (Apr. 1990). *See McCaw Equal Access Opposition*, *supra*, at 13.

## D.    *AT&T Wireless Equipment Manufacturing*

*AT&T is a leading manufacturer of cellular network equipment, including switching, transmission, and cell-site equipment, and related software.[48]  Other leaders include Ericsson, Motorola, and Northern Telecom.[49]  As much as 80 percent of the output of the AT&T cellular network manufacturing group may be sold to the BOCs.[50]  McCaw reportedly uses AT&T equipment in 43 percent of its systems, representing 22 percent of the population in McCaw service areas.[51]  Through the merger, AT&T will obtain McCaw's investment in Steinbrecher Corporation, which has developed a transceiver that can operate in any frequency band, using any technology.  Bell South Petition, supra, at 26-27.*

## III.    **THE RELEVANT MARKETS**

*Traditionally, the antitrust implications of a proposed merger are analyzed by a well-developed model that seeks to measure the effects of the consolidation within some "relevant market."[52]  The model begins with the characterization of each relevant product market affected by the merger.  The product market refers to the range of products or services that are or could easily be made relatively interchangeable, so that pricing decisions by one firm are influenced by the range of alternative suppliers available to the purchaser.  In their Horizontal Merger Guidelines, the National Association of Attorneys General define the relevant product market[53] by adding "suitable substitutes" to "[e]ach product produced in common by the merging parties." National Association of Attorneys General, Horizontal Merger Guidelines, § 3.1 (1993), reprinted in 64 Antitrust & Trade Reg. Rep. (BNA) No. 1608 (Special Supp.) ("NAAG Horizontal Merger Guidelines").  Where the*

---

48.  *Affidavit of Lawrence A. Sullivan* at 6-7, attached to *AT&T FCC Opposition*, *supra* ("Sullivan FCC Affidavit"); *Petition to Impose Conditional Grant to Create a Competitive Market, or Deny as Filed*, at 25 In re *American Telephone and Telegraph Company and Craig O. McCaw*, No. ENF-93-44 (F.C.C. Nov. 1, 1993)("*Bell South Petition*").  An average Series II cell site using AT&T equipment costs about $750,000. *Affidavit of John T. Stupka*, attached to *Southwestern Bell Petition*, *supra*, at ¶ 30 ("Stupka Affidavit").  A large capacity AT&T switch costs approximately $7 million.  *Id.* at ¶ 29.

49.  Sullivan FCC Affidavit, *supra*, at 6-7.

50.  *BellSouth Petition*, *supra*, at 26.

51.  *Southwestern Bell Petition*, *supra*, at 35.

52.  In general, whether two goods are within the same relevant market depends upon the "responsiveness of the sales of one product to price changes of the other." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956) (the "*Cellophane*" decision).

53.  In its *Cellophane* decision, the Supreme Court held that the relevant product market consists of all goods which users find to be reasonably interchangeable or which exhibit a high cross-elasticity of demand for the good in question. *Cellophane*, *supra*, 351 U.S. at 395.

*merger involves "the joinder of two levels or phases of production that are usually performed by different firms,"[54] so that there is no "product produced in common," the appropriate "horizontal" and "vertical" dimensions of the relevant product must be considered.[55]*

*The analysis then proceeds to a determination of the relevant geographic market. The relevant geographic market is defined as the area in which the sellers compete and in which buyers can practically turn for supply. U.S. v. Connecticut National Bank, supra, 418 U.S. 656, 668 (1974). The NAAG Horizontal Guidelines include within the relevant geographic market "the sources and locations where the customers of the merging parties readily turn for their supply of the relevant product," as well as suppliers of "closely proximate" buyers. NAAG Horizontal Merger Guidelines, supra, at § 3.2. Suppliers within the relevant geographic market for vertical mergers include all component providers whose output could feasibly be combined and offered at prices competitive with the products of the merged firm. See Heattransfer Corp. v. Volkswagenwerk, A.G., 532 F.2d 964, 980-82 (5th Cir.), cert. denied, 434 U.S. 1087 (1977).[56]*

### A.    *The Relevant Interexchange Service Markets*

*In the federal proceedings, the BOCs have alleged that a relevant product market exists for the wholesale[57] provision of long-distance cellular originated telephone calls.[58] It is true that the*

---

54.  R. Posner, *Antitrust Law:  An Economic Perspective* 197 (1976).

55.  *See* Bower, *Complementary Inputs and Market Power*, 31 Antitrust Bull. 51, 81 (1986). Thus, in many respects, the central issues faced by the Supreme Court in the recent *Kodak* decision were: (a) the horizontal issue of whether "one brand of a product can constitute a separate product," *Kodak* at 293, and (b) the vertical issue of what combination of parts, service, equipment, and information constituted a cognizable relevant market. *See Kodak v. Image Technical Services*, 119 L.Ed.2d 265, 293, 301. *See also Direct Testimony of John W. Mayo* filed with *Application*, *supra*, at 32 ("Mayo Testimony") (referring to the "vertical dimensions of this merger").

56.  The BOCs seem to take a similar position.  *See* Salop and Fisher Affidavit, *supra*, at 11 (apparently excluding certain interexchange carriers from the relevant market because "they are at a cost disadvantage . . . resulting both from reduced scale economies and from the corresponding need to fill in gaps in coverage as a long-distance reseller with higher costs than the major facilities-based carriers.")

57.  "Sandwiched around the basic common carriers are wholesalers and resellers.  Some pipeline or railroad companies that control valuable rights of way act as a carriers' carriers, offering bulk (usually fiber-optic) services to the ICs.  On the other side, resellers and value-added carriers operate their own switches but lease transmission capacity in bulk from the ICs." *Geodesic Network I*, *supra*, at 3.1-3.2.  "An FCC ruling that AT&T must permit resale of its services has allowed many resellers to enter the market very easily." *Id.* at 3.4.

58.  Salop and Fisher Affidavit, *supra*, at 10, 24.  Under the *MFJ*, the BOCs "and their cellular affiliates are not permitted to purchase long-distance service in bulk at wholesale or to vertically

*range of services "produced in common" by the merging parties consists of that narrow group of long distance calls. However, "because the wholesale long distance services purchased by . . . cellular carriers are essentially identical to the services purchased by other large volume customers,"[59] and since there is a very active[60] resale market for long-distance services,[61] arbitrage activities would defeat any attempt of the merging parties to raise cellular long distance rates above existing levels. See Willig and Bernheim Affidavit, supra, at 5. As AT&T has also persuasively argued, the limited product definition advanced by the BOCs implicitly assumes that AT&T could practicably engage in highly selective, possibly unlawful, and easily visible discriminatory pricing practices. See Willig and Bernheim Affidavit, supra, at 15-20. We conclude that the relevant product for the horizontal facet of the merger includes interexchange services that are resold or are available for resale within the United States,[62] such as those provided by AT&T, MCI, Sprint and other interexchange carriers.*

### B.      *The Relevant Markets for Local Cellular Services*

*Although the scope of the relevant market for cellular services has never been carefully examined, the courts which have addressed the issue have limited the market to the provision of "cellular telephone services"[63] in the various franchise areas established by the FCC in which the franchisee does business. See Metro Mobile CTS, Inc. NewVector Communications, Inc., 661 F.Supp.*

---

integrate into provision of the service. . . . In contrast, where the local cellular provider is, like McCaw, not an affiliate of [a BOC], the provider can purchase a long-distance service in bulk from an interexchange carrier at individually negotiated long-term contract wholesale prices. These carriers then resell the long-distance service on a retail basis to their subscribers. . . . Long-distance providers compete by bidding to provide wholesale long-distance service in bulk through long-term contracts with McCaw and other non-RBOC cellular carriers." *Id.* at 10.

59. *Affidavit of Robert D. Willig and B. Douglas Bernheim* at 5, attached to *AT&T FCC Opposition*, *supra* ("Willig and Bernheim Affidavit").

60. We take no position on the question of whether the resale market is fully competitive, as AT&T contends. *See* Willig and Bernheim Affidavit, *supra* at 5, 18.

61. In California, long distance resellers which purchase interexchange services at bulk rates and resell those services to subscribers to BOC cellular affiliates include: Execuline of Sacramento, Express Tel, Thrifty Telephone, TNC Long Distance, West Coast Telecommunications, Inc., TELNET Communications, Inc. and Celltoll Corporation. Letter from Gregory P. Landis to Lindsay Bower (Feb. 3, 1994).

62. The United States is the relevant geographic market. *See Prepared Testimony of Professor Jerry A. Hausman* at 36, filed In re Joint Application of American Telephone and Telegraph Company, et al. (P.U.C., Jan. 10, 1994) ("Hausman PUC Testimony").

63. Block carriers sell these services to consumers directly or through intermediaries such as retailers, agents, dealers, resellers, and broker-agents.

*1504, 1521 n.14 (D.Ariz. 1987), 892 F.2d 62 (9th Cir. 1989) ("NewVector");[64] Sunshine Cellular v. Vanguard Cellular Systems, 810 F.Supp. 486, 494-95 (S.D.N.Y. 1992). Thus, separate relevant markets for cellular services exist in each of the individual MSAs and RSAs in which McCaw does business. For purposes of this analysis, we also assume, along with the applicants,[65] that cellular franchisees will compete with specialized mobile radio ("SMR") operators[66] and PCS providers.[67] In adopting that approach, we note that telephone and cellular suppliers still do not compete[68] and that providers of other types of mobile systems, such as pagers, appear to have little constraining effect on cellular prices.*

### C.    *The Relevant Markets for Regional Cellular Services*

*In Sunshine Cellular, the court also recognized the existence of a separate relevant market for cellular telephone services provided throughout a cluster of FCC-authorized service areas. Sunshine Cellular, supra, 810 F.Supp. at 496.[69] The relevant market is defined by determining whether alternative goods which were "comparable in quality . . . could be produced at a cost no higher than*

---

64. In *NewVector*, the defendant contended that the product market included other forms of two-way communication, but accepted cellular telephone service as the relevant product for purposes of its summary judgment motion. *Id.* On the other hand, there was "no dispute that the relevant geographic market is the Phoenix Metropolitan Statistical Area as defined by the FCC." *Id.*

65. *See* Barksdale Affidavit, *supra*, at ¶¶ 8-9; Sullivan FCC Affidavit, *supra*, at 13 (SMR providers, such as NEXTel, "will compete with cellular service systems;" PCS systems "unquestionably could compete directly with existing cellular systems").

66. "SMR is, in essence, a private dispatch service that interconnects with the public network." *Geodesic Network II*, *supra*, at 4.15 n. 62.

67. "When [PCS] was introduced in the United Kingdom, it caused an immediate drop in the value of all cellular stocks, including those in the United States. This reflected investor concern over the impairment of the monopoly aspect of the cellular license." *See* G. Calhoun, *Wireless Access and the Local Telephone Network*, 143, 215 n. 31 (1992). *See also* Hausman PUC Testimony, *supra*, at 16 ("PCS already works. . . . Furthermore, cellular service (airtime) prices have fallen by about 1/3 since PCS was introduced in the U.K.").

68. *First Triennial Decision*, *supra*, 673 F.Supp. at 550-51; *U.S. v. Western Electric*, 578 F.Supp. 643, 650 (D.D.C. 1983) ("*Cellular LATA Decision*"); *U.S. v. Western Electric*, 1990-2 Trade Cases ¶ 68,177, at 64,450 (D.D.C. 1990). *See also Sunshine Cellular*, *supra*, 810 F.Supp. at 495.

69. In discussions with this office, Professor Sullivan acknowledged the existence of cognizable relevant markets for regional cellular services. Telephone conversation between Lindsay Bower, Lawrence Sullivan, Greg Landis, and John Mayo (Nov. 30, 1993. *See also* Memorandum from E. El Hamamsy, G. Maddaloni, S. Prysant, at Bates No. A000521 (Apr. 1990) (noting that "regional cellular networks will make interLATA cellular long distance feasible.")

*that of [the defendant's product] or, if no materials of the same quality existed, whether the quality differences [between the goods] were offset by differences in cost." Posner, supra, at 128.*

*A central feature of the services offered by cellular carriers is the geographical territory (the "calling scope"[70]) over which cellular calls are supplied and offered on an integrated basis.[71] By consolidating its operations into eight multi-LATA clusters,[72] McCaw has achieved substantial economies[73] in the reduction of switching and other operational costs. See Affidavit of Dr. Charles L. Jackson at ¶¶ 10-21, attached to the BOC Generic Wireless Reply[74]("Jackson Affidavit").[75] Clustering has also enabled McCaw to institute a billing or "bundled" service program in which some regional calls placed by subscribers are considered "local" and are billed at a flat rate.[76] However, the interexchange*

---

70. *Southwestern Bell Petition*, *supra*, at 61.

71. Craig McCaw has stated that, "These regional consolidations and coalitions are what create the most desirable service for customers." *See Geodesic Network II*, *supra*, at 4.66

72. McCaw clusters provide service to areas constituting 80 percent of McCaw's POPs. Higgins and Miller Affidavit, *supra*, at 14.

73. Higgins and Miller Affidavit, *supra*, at 14; *Cellular LATA Decision*, *supra*, 578 F.Supp. at 648-49. MCI affiant Richard Chandler has demonstrated that clustering is not necessarily the most economical mechanism for supplying cellular services to subscribers in low-density areas where transmission costs may become prohibitive. *Affidavit of Richard Chandler* at 6, 9, attached to letter from Michael H. Salsbury to Richard L. Rosen (Apr. 30, 1993) ("Chandler Affidavit"). Chandler has also shown that clustering does not necessarily result in the creation of flat rate areas. *Id.* at 8. However, Jackson does provide a conceptually valid approach for understanding the *major* efficiencies that can be derived from consolidating the operations of adjacent service areas. *See* Jackson Affidavit, *supra*; Telephone conversation between Lindsay Bower, Charles P. Mason, Steven Huels, Gregory P. Landis, David Carpenter, and Len Calley (Jan. 19, 1994).

74. *Reply of the Bell Companies in Support of Their Motion for Removal of Mobile and other Wireless Services from the Scope of the Interexchange Restriction and Equal Access Requirement of Section II of the Decree*, *United States v. Western Elec. Co.*, No. 82-0192 HHG (D.D.C. Aug. 3, 1992) ("*BOC Generic Wireless Reply*").

75. *See also* Higgins and Miller Affidavit, *supra*, at 14; *Motion of the Bell Companies for Removal of Mobile and other Wireless Services from the Scope of the Interexchange Restriction and Equal Access Requirement of Section II of the Decree* at 41, *United States v. Western Elec. Co.*, No. 82-0192 HHG (D.D.C., Dec. 13, 1991) ("*Generic Wireless Motion*").

76. *See* Jackson Affidavit, *supra*, ¶ 9. *See also McCaw Equal Access Opposition*, *supra*, at 13. ("Today, cellular subscribers may place and receive `long distance' calls using their cellular telephone whether they are in their home system or roaming. Neither McCaw nor, to its knowledge, any other cellular carrier imposes a surcharge on standard MTS rates for this valuable capability. Rather, subscribers pay less than `full market' long distance rates for interexchange cellular calls included within wide-area calling plans, and in almost every other situation, pay no

*restrictions of the MFJ prohibit BOCs (which do not have all necessary "waivers"[77]) from making similar offerings available at competitive costs and rates,[78] and no other cellular providers, such as GTE, have created regional clusters that are coterminous with McCaw service areas. AT&T claims to the contrary,[79] we conclude that McCaw is currently the only supplier of the appropriately defined multi-LATA regional cellular services offered within all or part of each of its eight clusters.[80]*

## IV.    *THE MFJ, REGIONAL CELLULAR COMPETITION, AND CELLULAR BYPASS*

*The interexchange restrictions of the MFJ apply to "exchange telecommunication services" provided by the BOCs, including cellular and other mobile services. Cellular LATA Decision, supra, 578 F.Supp. at 645. Contending that they do not have "bottleneck control over the provision of interexchange services to cellular customers" and cannot productively discriminate against competing cellular providers, the BOCs have petitioned the District Court for removal of wireless from the*

---

more than basic IXC rates.")

In FCC equal access proceedings, "[n]umerous cellular carriers described how they provide seamless, wide-area service at lower rates than would be available from the IXCs. These commenters also pointed out that many cellular carriers share with their customers bulk discounts obtained from IXCs." *Reply of McCaw Cellular Communications, Inc.* at 4, In re Policies and Rules Pertaining to the Equal Access Obligations of Cellular Licensees, No. RM-8012 (F.C.C., Oct. 15, 1992)("*McCaw Equal Access Reply*"). Nonetheless, AT&T has made the assertion that "clustering" does not facilitate the creation of flat rate areas. *See AT&T's Opposition to RBOCs' Motion to "Exempt" Wireless Services from Section II of the Decree* at 76 n. 103, *United States v. Western Elec. Co.*, No. 82-0192 HHG (D.D.C. Apr. 27, 1992) ("*AT&T Generic Wireless Opposition*").

77. *See Geodesic Network II, supra*, at 4.88-4.99, Tables 4.14-4.16; *Generic Wireless Petition, supra*, at 47-52 (noting an average approval period of 19 months for cellular waivers). *See also AT&T Generic Wireless Opposition, supra*, at 7, 24 n. 29, 26 n. 33; *Reply of the Bell Companies in Support of Their Motion for Removal of Mobile and other Wireless Services from the Scope of the Interexchange Restriction and Equal Access Requirement of Section II of the Decree* at 22, United States v. Western Elec. Co., No. 82-0192 HHG (D.D.C. Aug. 3, 1992) ("*BOC Generic Wireless Reply*").

78. *See* B. Davis, "Project Airtime" at Bates No. A002070 (Jan. 11, 19912); Memorandum from L. Chakrin, "Briefing for Apache", at Bates No. A001844 (Nov. 4, 1992).

79. The applicants claim that, "The MFJ allows the RBOCs to offer the same 'seamless' services that McCaw provides, and the only differences between the RBOCs and McCaw are that there are occasionally differences in the sizes of "local" calling areas . . ." *AT&T FCC Opposition, supra*, at 60; *AT&T Generic Wireless Opposition, supra*, at 76 n. 103.

80. NEXTel and other SMRs may enter that market in the near future. *See*, e.g., Sullivan FCC Affidavit, *supra*, at 12-13.

*interexchange restrictions of Section II of the MFJ.[81]  That restriction has limited the ability of the BOCs to efficiently "cluster" adjacent service areas, interconnect with other providers, and obtain network and routing efficiencies available to McCaw and other competitors.  As a result, the BOCs cannot effectively compete in many regional cellular markets, including portions of McCaw's California/Nevada cluster.*

*The minimum efficient size of many, if not most, clusters is larger than a single LATA.  Thus, in Florida, McCaw has seven switches "where it provides integrated service to 13 FCC cellular market regions located in seven different LATAs."  Jackson Affidavit, supra, at 9.  The MFJ interexchange restriction prohibits BOCs from forming such multi-LATA clusters or from purchasing for resale long distance services at bulk rates, and thereby attaining many of the efficiencies that will be available to the integrated AT&T/McCaw.  For similar reasons, the BOCs cannot take full advantage of their landline system in the placement and routing of cellular long distance calls.  Until recently, the interexchange restriction also prohibited BOCs from using a "dedicated MTSO-to-MTSO link" to "hand off" calls of subscribers travelling to different LATAs,[82] which would result in only cellular air time charges.  Instead, BOC customers roaming in adjacent LATAs had to obtain service from their preselected interexchange carriers, resulting in frequent delays, fewer call completions, disconnections, as well as both air time and long distance charges.  Procedures exist for obtaining waivers from these restrictions in individual cases[83] and Judge Greene has recognized the "economic efficiencies which could be produced by integrated, multi-LATA systems,"[84] but the approval process*

---

81.  The BOCs originally petitioned for the removal of wireless services from both the interexchange and the equal access provisions of Section II.  They recently withdrew their request for relief from the equal access requirement in a letter to the Department of Justice.  Letter from Michael K. Kellogg to Richard L. Rosen (September 24, 1993).

The competitive effects of equal access requirements are not clear.  If they were not subject to interexchange requirements, the BOCs could purchase long distance services in bulk.  Furthermore, if the resulting cost savings were passed on to consumers, as the BOCs contend they would be (*see* Higgins and Miller Affidavit, *supra*, at ¶¶ 30, 50-53), most BOC subscribers would presumably select the BOC as their interexchange carrier.  Moreover, the large customer base would apparently justify the use by the BOC of a direct connection to the POP.

82.  "Intersystem handoff is a service which [permits] the mobile telephone switching office (MTSO) of a particular [cellular operator] to be interconnected with the MTSOs of an adjacent cellular system so that cellular telephone calls already in progress can be handed off from one cellular system to the adjacent system, as a cellular customer approaches and crosses the boundary between the two cellular systems."  *U.S. v. Western  Elec. Co.*, No. 82-0192, slip. opn. at 7-8 (D.D.C., Sept. 12, 1990).

83.  *See Generic Wireless Motion*, *supra*, at 47-53.

84.  *Cellular LATA Decision*, *supra*, 578 F.Supp. at 648-49.

*takes an average of 19 months, which is "an eternity in the competitive race and technological revolution taking place in mobile services."*[85]

*AT&T opposes the BOCs' motion because "the provision of interexchange services to mobile customers absolutely depends on the RBOCs' landline access facilities." AT&T Generic Wireless Opposition, supra, at 45 n. 55.*[86] *In fact, cellular providers can route their long distance traffic to interexchange carriers over direct connections from the MTSO to the POP or over the LEC's switched network.*[87] *In some instances, they can also route long distance traffic over their own network.*

*The routing scheme actually chosen is a function of cost. BOC Generic Wireless Reply, supra, at 31. It is true that switched service alternatives to the LECs' networks are limited.*[88] *However, direct connections leased or furnished by LECs, CAPs, interexchange carriers*[89] *and other providers*[90] *are virtually identical and are offered at comparable fixed, monthly rates.*[91] *Routing long distance calls over the PSTN (which requires payment of a per minute charge) is economical only at relatively low traffic volumes. Jackson Affidavit, supra, ¶ 30; Hausman Affidavit, supra, ¶ 45.*

---

85. *Generic Wireless Motion*, *supra*, at 48. *See also Affidavit of Jerry A. Hausman* at ¶ 52, attached to *BOC Generic Wireless Reply*, *supra* ("Hausman Affidavit").

86. *AT&T Generic Wireless Opposition*, *supra*, at 4, 40 ("The decisive fact is that the RBOCs control the bottleneck 'landline' facilities that connect these systems to interexchange carriers networks." *Id.* at 4.). The BOCs reply that AT&T attempts to obscure the issue "when it states that it obtains access to cellular carriers `either through a LEC access tandem [switch] or through a LEC-provided connection to an MTSO,' as if there were no difference between the two forms of connection." *See BOC Generic Wireless Reply*, *supra*, at 32 n. 37, 6.

87. Cellular long distance traffic routed over the BOC's PSTN goes from the MTSO to either (a) the LEC end office (a type I connection), which is the most expensive arrangement or (b) an access tandem (a Type IIa connection) and then to the POP. Memorandum prepared by L. Chakrin, *Cellular Access Arrangements* at Bates No. A100916 (March 20, 1991).

88. CAPs do "have the technical capability to provide switched access or switched local exchange service for end users connected to their network." California Public Utilities Commission Division of Ratepayer Advocates, *Report on IntraLATA Competition in California and Program Proposals*, Exhibit 559, at 2-11 (Sept. 23, 1991) ("*Exhibit 559*").

89. Jackson Affidavit, *supra*, at ¶ 22; AT&T, *Cellular Access Arrangements*, No. A100917 ("In certain MSAs, cellular traffic reaches a point where it makes economic sense [for the IEC] to loop a high capacity T1.5 facility from the MTSO to AT&T's POP.")

90. Jackson Affidavit, *supra*, at ¶ 22.

91. *See* Jackson Affidavit, *supra*, at ¶¶ 22-32.

*Because of the ready availability of these numerous "supply substitutes," LECs in most service areas lack bottleneck control over the access of cellular companies to interexchange company POPs.[92]*

*Data provided by AT&T demonstrates the extent of the bypass opportunities available to cellular providers. In both California and the United States, non-BOC cellular providers route approximately 92 percent of their AT&T long distance calls over direct links,[93] and somewhat less than 10 percent[94] (not the one percent AT&T usually claims[95]) of the national direct traffic flowed over non-LEC facilities.[96] McCaw figures were similar, although the national figures do not account for*

92. *See* Landes and Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 945-50, 963-67 (1981). Thus, included within the relevant market for access to any relatively high density population area are the local telephone company, all CAPs capable of serving that area, and possibly other LECs and CAPs. For identical reasons, long distance services available for resale are substitutes for, and in the same relevant market as, cellular long distance services. In assessing the relevant market for cellular long distance services, AT&T is a strong proponent of the concept of supply substitutes. *See* Section IV.A., *supra*.

However, in assessing each local market for access services, AT&T apparently contends that CAPs are not competitors or even fringe suppliers because they "only" serve "about 116 cities" and "exist at the sufferance of the LECs, which possess the ability to underprice them and forestall their expansion . . ." *Draft Affidavit for Tom Herr* at ¶ 12, attached to letter from George Deukmejian to Roderick E. Walston (January 31, 1994) ("Draft Herr Affidavit"). Nonetheless, in a conversation with this office, AT&T director for access procurement, Steven Huels, agreed with the conceptual validity of the approach taken by Charles Jackson in his affidavit and Huels stated that local telephone companies have responded to CAPs by "dramatically" reducing direct connection rates under their "flexible pricing" programs. Telephone conversation between Lindsay Bower, Charles P. Mason, Steven Huels, Gregory P. Landis, David Carpenter, and Len Calley (Jan. 19, 1994). Moreover, Landes and Posner indicate (and AT&T would presumably argue in the long-distance context) total CAP services should be considered because the relevant market properly includes (in the absence of significant transportation costs) "the total capacity (wherever located) of the distant sellers rather than their actual output." Landes and Posner, *supra*, at 966.

93. Letter from Gregory P. Landis to Lindsay Bower, at 2 (Feb. 2, 1994); Letter from Gregory P. Landis to Lindsay Bower, at 2 (Feb. 3, 1994); telephone conversation between Gregory P. Landis and Lindsay Bower (Dec. 22, 1993).

94. *See* letter from Gregory P. Landis to Lindsay Bower, at 2 (Feb. 3, 1994); telephone conversation between Gregory P. Landis and Lindsay Bower (Dec. 22, 1993).

95. *See AT&T Generic Wireless Opposition*, *supra*, at 43, 46.

96. DRA has found that the cost of dedicated access fell 50 percent between 1985 and 1991 and that "bypass" may now be economical for "even medium sized businesses." *Exhibit 559*, *supra*, at 2-4. AT&T's director of access procurement, Steven Huels, states that local companies have responded to CAPs by "dramatically" reducing direct connection rates under their "flexible

*interLATA traffic carried within the McCaw network itself.[97]   On the other hand, BOC cellular affiliates  -- which are "forced to splinter their long distance traffic among different [interexchange carriers]"[98] -- route approximately 75 percent of their AT&T calls over the more expensive PSTN.[99]*

*Finally, we note that approval of the Generic Wireless Motion would not create any incentives for the BOCs to anticompetitively discriminate against or raise the costs of their cellular rivals.[100]*

pricing" programs.  Telephone conversation between Lindsay Bower, Charles P. Mason, Steven Huels, Gregory P. Landis, David Carpenter, and Len Calley (Jan. 19, 1994) ("Huels Telephone Conversation").  Thus, Huels states that Ameritech has reduced direct connection rates for Chicago, in response to pressure from CAPS, to one-fifth of what they were only several years ago. *Id.*

97.  "The vast majority of the nationwide long distance traffic originating at McCaw's MTSOs (including cellular long distance traffic in California) is routed over LEC-provided dedicated lines procured by AT&T.  Typically, McCaw -- either directly or, in California, through its certificated long distance resellers -- purchases long distance traffic from AT&T's Software Defined Network ("SDN") and Tariff 12, both of which include components for usage and resold-LEC transport facilities.  By far the vast majority of McCaw-originated cellular long-distance traffic travels over dedicated access connections."  Letter from Gregory P. Landis to Lindsay Bower, at 2-3 (Feb. 2, 1994); telephone conversation between Gregory P. Landis and Lindsay Bower (Dec. 22, 1993).

98.  *BOC Generic Wireless Reply*, *supra*, at 32.  Most non-BOC cellular operators provide interexchange services to their subscribers as long distance resellers.  *See* Higgins and Miller Affidavit, *supra*.  Charles Jackson has demonstrated that direct connections become economical at lower traffic volumes than most non-BOCs carry over their exclusive resale contracts.  Jackson Affidavit, *supra*, at ¶¶ 29-33.  However, the *MFJ* interexchange and equal access restrictions prevent BOCs from providing cellular long distance services as a reseller or from entering into an exclusive arrangement with a single long distance carrier.  It is also possible that the cost of isolating and directly routing only the long distance calls placed through the BOC affiliate's leading long distance carrier(s) (usually, AT&T) would be prohibitive, even if placing that volume of calls on a dedicated line would otherwise be justified.  Moreover, cellular long distance traffic in each BOC service area is "split" among several suppliers and only those long distance carriers operating in the largest service areas apparently carry sufficient volumes to warrant the use of dedicated access.  In any event, the direct connection rate is much lower among BOC cellular affiliates than among non-BOC operators.  MCI has disputed the "crossover point" at which direct connections become economical, but Jackson's general conceptual approach appears to be valid.  *See* Affidavit of Richard Chandler at 10-11, attached to letter from Michael H. Salsbury to Richard L. Rosen (Apr. 30, 1993); Huels Telephone Conversation, *supra*.

99.  Letter from Gregory P. Landis to Lindsay Bower, at 2 (Feb. 2, 1994); Letter from Gregory P. Landis to Lindsay Bower, at 2 (Feb. 3, 1994); telephone conversation between Gregory P. Landis and Lindsay Bower (Dec. 22, 1993).

100.  AT&T contends that the ability of a LEC to raise the access costs of interexchange carriers is "acute," *AT&T FCC Opposition*, *supra*, at 47, but separately estimates that cellular

*Discriminatory practices directed at non-BOC cellular competitors would not be effective unless customers of the rival "could readily detect that they were receiving inferior long distance connections," and yet the various regulatory agencies would be "unlikely to let such patently illegal [and necessarily obvious] discrimination to persist." BOC Generic Wireless Reply, supra, at 34-35. As alternatives, BOCs might instead consider degrading the (1) the access of long distance carriers to the BOC's landline network or (2) "access to the local access network enjoyed by the cellular firm itself." BOC Generic Wireless Reply, supra, at 33, 34 n.40.[101] However, the first strategy would "discourage use of [the IEC] system by both mobile and landline customers." Id. at 33. Furthermore, the theoretical incentive to engage in the second strategy already exists and would in no way be increased by MFJ relief. See Cellular LATA Decision, supra, 578 F.Supp. at 651.[102] We also note that the profit-maximizing incentive of a cellular provider with (assumed) market power would be to price its "core service," air time, above marginal cost, and to offer complementary services, such as long distance and related access services, at competitive rates.[103] We conclude that the BOCs lack the incentive or the market power to significantly raise cellular long distance access rates of its rivals and, therefore, encourage PUC support for the BOCs' Generic Wireless Petition.*

## V.     *THE NATURE AND COMPETITIVE EFFECTS OF THE MERGER*

---

interexchange services constitute a competitively insignificant .3 percent of the long distance market. *See* Affidavit of Professor Glenn Ellison at ¶ 16, attached to *AT&T FCC Opposition*, *supra*. *See also* Section VI.B., *infra*; *Petition for Rulemaking*, In re Petition for Rulemaking to Determine the Terms and Conditions under which Tier 1 LECs Should Be Permitted to Provide InterLATA Telecommunications Services, No. R.M.- (F.C.C. July 15, 1993).

  In the Draft Herr Affidavit, *supra*, AT&T also apparently contends that permitting BOC entry into the cellular long distance market would induce BOCs to degrade the network, cross-subsidize or otherwise advantage themselves and their affiliates, and use AT&T connection requests as a subterfuge for obtaining competitive information. We find these arguments speculative and wholly analogous to arguments made by the BOCs in support of their notion of an identifiable market for cellular long distance services. In fact, where the BOCs raised that issue, AT&T (much like the BOCs here) demonstrated the infeasibility of discriminatorily pricing cellular long distance services. *See* Willig and Bernheim Affidavit, *supra*, at 15-20.

101.  The FCC requires LECs to provide non-wireline carriers with interconnections that are equal in price and quality to those provided to LEC affiliates. *Geodesic Network II*, *supra*, at 4.7.

102.  *See also* Hausman Affidavit, *supra*, at ¶¶ 36, 42.

103.  *Generic Wireless Motion*, *supra*, at 32-33; Hausman Affidavit, *supra*, at ¶ 40, n. 40. *But see AT&T Generic Wireless Opposition*, *supra*, at 38.

Mergers are "conventionally" categorized as horizontal, vertical, or conglomerate.[104] Aspects of this consolidation fall within all three categories, but, as AT&T has noted, the "heart" of the transaction is the vertical relationship "between a firm offering interexchange services and a firm offering cellular services." The merger does appear to offer significant cost efficiencies in the provision and expansion of regional cellular services, which are not currently available to PacBell and the other BOCs. AT&T may pass some of the resulting cost savings to consumers, but we believe the magnitude of those savings will increase if the MFJ prohibition on the BOC provision of cellular interexchange services were lifted.

Horizontal effects, which would result from the consolidation of the interexchange services of the two operations, would be de minimus. Furthermore, although a merged AT&T would not independently enter the wireless market through the PCS auction, adverse competitive effects resulting from the elimination of AT&T as a potential competitor of McCaw in the local and regional cellular markets are highly speculative and probably minimal. Finally, we have found no evidence that AT&T and McCaw have ever engaged in any form of "franchise" or "yardstick" competition in this state.

## A. *The Vertical Integration of McCaw Cellular and AT&T Long Distance Operations*

The principal competitive effects of this merger will be in the relevant markets for regional cellular services,[105] where McCaw's existing position will be strengthened and the BOCs will be correspondingly limited in their relative ability to compete. McCaw's eight clusters already constitute the most valuable collection of cellular properties in the United States. AT&T can consolidate and strengthen this leadership position by using its financial resources, long distance operations and related technical services to accelerate the expansion and linkage of these clusters. At the same time, the MFJ's interexchange restriction severely hinders the ability of some of McCaw's strongest and most natural rivals, the BOCs, to provide similar services.[106] The BOCs do not question the efficiencies that would arise from the merger, but they have attempted to condition approval of the merger on AT&T withdrawal of opposition to the Generic Wireless Motion. We conclude that the integration of AT&T and McCaw will create pro-competitive efficiencies. However, the degree to which the public will benefit from those efficiencies will depend upon the extent of competition faced by the consolidated entity. We also conclude that AT&T opposition to the Generic Wireless Motion is protected by the Noerr Pennington doctrine.

---

104. Williamson, *Vertical Merger Guidelines: Interpreting the 1982 Reforms*, 71 Cal.L.Rev. 604, 605 (1983).

105. Thus, AT&T argues that "a ban on joint marketing [of wireless and long distance services] would be inefficient and would nullify central benefits of the merger." *AT&T FCC Opposition*, *supra*, at 81.

106. The District Court recognized that the BOCs would encounter "significant competitive disadvantages . . . were they strictly confined to LATA boundaries in all areas." *Cellular LATA Decision*, *supra*, 578 F.Supp. at 649.

## 1. *The Efficiencies*

*There is little doubt that synergies between the applicants "offer[ ] real potential for enhancing [McCaw] as a competitor in the provision of mobile telephone services."[107] AT&T has vast financial resources, while McCaw is highly leveraged.[108] With AT&T capital, McCaw can more easily expand existing clusters and fill some of the "holes" in its nationwide network by acquiring additional cellular properties and actively participating in the PCS auction.[109] AT&T acknowledges that "long distance service can be viewed as an input into the provision of cellular service"[110] and AT&T long distance facilities, such as its microwave sites,[111] can be readily consolidated with McCaw's regional operations. These long distance facilities, along with AT&T technical services, can also enhance and expand the extent of scale and scope economies available in regional clusters and the larger AT&T and McCaw networks.[112] In addition, the merged company can apply AT&T technical and networking resources to McCaw's credit verification operations, thereby facilitating roaming in service areas where fraud detection capabilities are currently inadequate.[113] AT&T traffic routing and network optimization expertise will further expand roaming capabilities[114] and reduce the merged companies' operating costs.[115] In fact, in many instances (as in existing McCaw flat rate areas), integration will*

---

107. *Application*, *supra*, at 22.

108. McCaw has a net book debt ratio of over 70 percent. *Application*, *supra*, at 23-24. McCaw admittedly needs additional capital. Barksdale Affidavit, *supra*,. ¶¶ 13, 21-23; *AT&T FCC Opposition*, *supra*, at 31-32.

109. *Affidavit of Richard P. Rozek* at 11, attached to *BellSouth Petition*, *supra*.

110. Mayo Testimony, *supra*, at 26 n. 6.

111. Mayo Testimony, *supra*, at 36; Direct Testimony of Steven W. Hooper at 24, filed with *Application*, *supra* ("Hooper Testimony").

112. *See Cellular LATA Decision*, *supra*, 578 F.Supp. at 648-49; *Southwestern Bell Petition*, *supra*, at 21-22; Sullivan FCC Affidavit, *supra*, at 12 ("attaining positions in multiple markets can yield scale or scope advantages and facilitate handing off calls of roaming subscribers"); McCaw Cellular Communications, Inc., *McCaw's Goals and Values* 8-9 (Jan. 1991)(declaring intent to "[c]apture long distance economi[e]s," and to "[m]aintain[] [its] long distance intra/interLATA revenue advantage").

113. Inadequate fraud detection capabilities currently limit roaming services available to cellular subscribers visiting New York City. *See also Application*, *supra*, at 24; Mayo Testimony, *supra*, at 36; AT&T Doc. No. Memorandum from L. Chakrin, *"Wireless" -- Board Presentation*, at Bates No. 000433 (Sept. 1991) (AT&T can provide verification in "two seconds" versus "45 minutes").

114. Barksdale Affidavit, *supra*, at ¶ 26.

115. *See* Mayo Testimony, *supra*, at 36.

*be so complete that it will be impossible to "efficiently" offer long distance and other services on a separate, unbundled basis.[116]*

*Although parties to a vertical merger routinely claim that their transaction will generate "complementarities and synergies,"[117] we have no reason to dispute the existence of the efficiencies claimed by the applicants. Even so, the creation of efficiencies[118] does not preclude the possibility that the transaction will have an anticompetitive effect and their existence does not, therefore, constitute an absolute defense.[119] In fact, a "long-standing judicial concern associated with vertical mergers is their potential to create barriers to entry."[120]*

### 2. *The Merger, the MFJ, and Barriers to Entry*

*In this matter, the BOCs suggest that AT&T's acquisition of McCaw, in combination with AT&T's opposition to the Generic Wireless Motion, will create competitively objectionable barriers*

---

116. We, therefore, disagree with BOC proposals to condition the merger on unbundling requirements. *See AT&T FCC Opposition*, *supra*, at 74, 78; Willig and Bernheim Affidavit, *supra*, at 34-36 (discussing "technological" and "transactional" efficiencies).

117. *See* Mayo Testimony, *supra*, at 35.

118. *See AT&T FCC Opposition*, *supra*, at 70, n. 133. Various procompetitive effects of vertical integration have been identified:

> The most popular [argument for vertical integration] has been that if economies of scope between successive stages due to technological or organizational interrelationships are strong enough, these activities should be provided under joint ownership. Other arguments for Vertical Integration have been the avoidance of factor distortions in monopolized markets; uncertainty in the supply of the upstream good with the consequent need for information by downstream firms; and the transfer of risks from one sector of the economy to another. Furthermore, it has been pointed out that transaction costs might create important incentives for vertical integration.

Williamson, *supra*, 71 Cal.L.Rev. at 604, n. 3, *quoting* Kleindorfer & Knieps, *Vertical Integration and Transaction-Specific Sunk Costs*, 19 Eur.Econ.Rev. 71 (1982) [citations omitted].

119. However, Areeda and Turner have proposed that "substantial efficiencies" resulting from a vertical merger be an "absolute defense." 4 P. Areeda and D. Turner, *Antitrust Law*, ¶ 1016 at 273-80 (1980). For discussions of the "efficiencies defense," *see* Stockum, *The Efficiencies Defense for Horizontal Mergers: What is the Government's Standard*, 61 Antitrust L.J. 829 (1993); Fisher & Lande, *Efficiency Considerations in Merger Enforcement*, 71 Cal.L.Rev. 1580 (1983).

120. W.D. Collins and J.R. Loftis III, *Non-Horizontal Mergers: Law and Policy* at 63 (1988).

*to entry.[121]  One of the central issues analyzed by the Department of Justice in its 1984 Vertical Merger Guidelines was where profitable entry after the merger would require simultaneous entry in both of the markets in which the integrated firm operates.  The merger was viewed to be anticompetitive to the extent the new, post-merger requirement for simultaneous entry into both markets decreases the likelihood that entry will occur in the noncompetitive market.[122]*

*Through its opposition to the Generic Wireless Motion, AT&T seeks to deny the BOCs many of the types of efficiencies (including those that provide savings from bundling) that will be achieved through its merger with McCaw.  In terms of the DOJ Vertical Merger Guidelines, the MFJ currently stands as an absolute barrier to BOC entry into the interexchange market.[123]  Moreover, because of the synergies claimed by AT&T between the supply of regional cellular and long distance services, competitive entry into regional markets served by the surviving entity (the "primary markets") will require entry into the interexchange market (the "secondary markets").[124]  Finally, we note that AT&T will face limited competition in the relevant markets for regional cellular services from other interexchange carriers which have yet failed to successfully combine their cellular and long distance operations[125] and that BOC affiliates are among McCaw's strongest competitors in the local cellular markets.  Together, these conditions strongly suggest that AT&T's cost advantage over the BOCs and other cellular carriers in providing regional cellular services would enable AT&T to establish a price*

---

121.  *See BellSouth Petition*, *supra*, at 20.

122.  This problem could exist if three conditions were present:

First, the degree of vertical integration between the two markets must be so extensive that entrants to one market (the "primary market") also would have to enter the other market (the "secondary market") simultaneously.  Second, the requirement of entry at the secondary level must make entry at the primary level significantly more difficult and less likely to occur.  Finally, the structure and other characteristics of the primary market must be otherwise so conducive to non-competitive performance that the increased difficulty of entry is likely to affect its performance.

United States Department of Justice Merger Guidelines, 4 Trade Reg. Rep. (CCH) ¶13,103 at §4.21 (June 4, 1984).

123.  Dr. Hausman characterizes the *MFJ* as an "artificial inhibition on entry."  Hausman PUC Testimony, *supra*, at 41.  *See Generic Wireless Motion*, *supra*, at 5-6 (referring to entry barriers to several telecommunications markets).

124.  *See Southwestern Bell Petition*, *supra*, at 37 ("AT&T's acquisition of McCaw will make it significantly more difficult to enter the wireless market without being vertically integrated with a long-distance carrier."); *BellSouth Petition*, *supra*, at 20.

125.  *See Southwestern Bell Petition*, *supra*, at 50-52 (describing MCI's periodic entry into and exit from the wireless business and GTE's recent abandonment of its long distance businesses).

*floor above marginal costs or to exclude competitors from regional cellular markets in which they compete.[126]*

*The MFJ may already limit the extent of regional cellular competition between the PacTel and McCaw cellular affiliates serving the Sacramento, Stockton, and Chico LATAs. McCaw currently uses a single MTSO to provide service to its subscribers throughout that region on an integrated basis. PacTel also uses only one switch, located in Sacramento, to route cellular calls within each of the three LATAs.[127] However, because of the MFJ, PacTel must transfer calls to the preselected interexchange carrier (which immediately routes the call back to PacTel) of any subscriber crossing the boundaries between any two of those three LATAs.[128] PacTel estimates that these wholly unnecessary and redundant transfers are largely responsible for the 2,000 calls it estimates are dropped per business day at its Mather and Lodi system cell sites.[129] These transfers also increase PacTel operating costs. The District Court did not grant PacTel's request for a waiver, which had been filed two years earlier, because of an inadequate showing of the court's unique requirement of a "community of interest in what is a single `metropolitan complex.'"[130] Although PacTel will not be subject to the MFJ after the "spinoff," the MFJ will still apply to PacBell, Bell South, U.S. West and other BOCs which may enter California markets for local or regional cellular services in the future.*

### 3. AT&T Opposition to the Generic Wireless Motion and the Noerr Pennington Doctrine

*In its Noerr decision, the Supreme Court "shield[ed] from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." United Mine Workers of America v. Pennington, 381 U.S. 657, 670 (1965), citing Eastern R.R. Pres. Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961). Thus, concerted petitioning activity designed to persuade legislators or other governmental officials to impose a restraint on competition is beyond the reach of the antitrust laws. The Supreme Court has extended this doctrine to include attempts to influence adjudicative bodies. See California Motor Transport Co v. Trucking Unlimited, 404 U.S. 508 (1972). In particular, the*

---

126. *See BellSouth Petition*, *supra*, at 20 ("AT&T/McCaw would have a cost advantage over the RBOCs in providing cellular service. As a result, AT&T/McCaw will be able to reap supranormal profits if it priced the services similarly to its RBOC competitor. AT&T/McCaw would also have the ability to price its service below the RBOC's cost. Because the RBOC could not respond competitively to this pricing behavior without incurring losses, the RBOC would eventually be forced to exit the market.")

127. *Request of Pacific Telesis Group for a Waiver of Section II(D) to Provide MultiLATA Cellular Service in the Sacramento, Stockton, and Chico LATAs*, at Attachment C, United States v. Western Elec.Co., No. 82-0192 HHG (D.D.C. Sept. 26, 1988).

128. *Id.* at 3.

129. *Id.* at 5.

130. *U.S. v. Western Elec. Co.*, slip op. at 32 (D.D.C. Sept. 12, 1990).

*doctrine is applicable to efforts to initiate and pursue litigation for anticompetitive purposes. McGuire Oil Co. v. Mapco, Inc., 1992-1 Trade Cases ¶ 69,799, at 67,702-704 (11th Cir. 1992). Thus, even though the MFJ prevents the BOCs from providing fully competitive regional cellular services, AT&T litigative activities in opposition to the BOCs' Generic Wireless Motion may be protected by the Noerr-Pennington doctrine.*

## B.  *The Horizontal Consolidation of the Long Distance Operations*

*A merger between competitors violates Section 7 of the Clayton Act if it significantly enhances market power or facilitates coordination between competitors.  Because it is relatively difficult to challenge vertical mergers,[131] the BOCs have "gone to great lengths in an effort to re-cast the merger as a horizontal combination"[132] between two suppliers of cellular long distance services.[133] However, as noted above, long distance services available for resale are strong substitutes for cellular long distance services,[134] arbitrage opportunities would defeat attempts to price discriminate between cellular providers and other long distance customers,[135] and the relevant geographic market would include all long distance services available for resale throughout the United States.[136] McCaw is a very important supplier of cellular services, but its sales within the wholesale long distance market are trivial compared to those of AT&T.[137] The merger of the long distance operations of the two companies will have only a minimal impact on the long distance industry, regardless of whether the market for those services is in fact competitive.[138]*

---

131.  *See* Willig and Bernheim Affidavit, *supra*, at 2.

132.  Willig and Bernheim Affidavit, *supra*, at 2.

133.  *See* Salop and Fisher Affidavit, *supra*, at 6.

134.  *See* Willig and Bernheim Affidavit, *supra*, at 17-18.

135.  Willig and Bernheim Affidavit, *supra*, at 5.  GTE reportedly "purchases all wholesale long distance services from AT&T -- both for cellular and for other purposes -- under a single wholesale contract, and in effect resells a portion of this long distance capacity to its own cellular unit."  *Id.* at 18-19.

136.  *See* Willig and Bernheim Affidavit, *supra*, at 28-30.

137.  Professor Ellison estimates McCaw's share at .3 percent.  Affidavit of Professor Glenn Ellison at 7 n.3, attached to *AT&T FCC Opposition*, *supra*.  Assuming an AT&T market share of 60 percent, the merger will increase the industry HHI by less than 40 points.

138.  The BOCs contend that the long distance markets are not competitive.  *See* Willig and Bernheim Affidavit, *supra*, at 14.  Industry observers do agree that AT&T has over 60 percent of the $50 billion market for conventional, landline long distance services.  Hall, *supra*, at 18; Jerry A. Hausman, *The Long-Distance Markets Today*, at 5 (Nov. 12, 1993), attached to *Opposition to the Motion of American Telephone & Telegraph Company for Reclassification  as a Nondominant Carrier*, In re Policy and Rules Concerning Rates for Competitive Common

## C.    *AT&T as a Potential Competitor in the Relevant Markets for Cellular Services*

In the absence of the merger, it is theoretically possible that AT&T and McCaw would have competed at some time in the future in certain relevant markets for wireless services.  AT&T acknowledges that, prior to the merger, it was a "potential" supplier of PCS services.  When those services become commercially available, they will "rely on `microcells served by small, low power, digital transceivers, providing wireless short range links on one side, and connections to landline networks and higher powered cellular networks on the other."  Geodesic Network II, supra, at 2.17.  The FCC expects that supply of PCS services "will be subject to substantial competition, both from other PCS services . . . [and from] cellular services."

Under the disputed[139] "actual potential" competition doctrine, the "challenging party would have to show that the acquiring firm had the capacity, interest, and economic incentive to enter the market [at some time in the future.  Even when there is no  . . . present effect, the outside firm . . . might add beneficially to competition at that future time.]  Economic incentive . . . has been defined as the likelihood that the acquiring firm could earn a profit after entry.  Finally, the alleged entry must be likely to occur in the near future."  Pitofsky, New Definitions of Relevant Market and the Assault on Antitrust, 90 Columbia L.Rev. 1805, 1831-32 (1990).[140]

Beginning in May 1994, the FCC will begin to distribute licenses for the right to provide PCS licenses in "basic trading areas" ("BTAs") and "major trading areas" ("MTAs") throughout the

---

Carrier Services and Facilities Authorization Therefore, No. 79-252 (F.C.C. Nov. 12, 1993) ("*BOC Reclassification Opposition*"); AT&T, *1992 Annual Report*, at 21.  There is also widespread agreement that industry capacity far exceeds current demand, (Hausman PUC Testimony, *supra*, at 18; *BOC Reclassification Opposition*, *supra*, at 6; Hall, *supra*, at 23) and that "800" (Basket "2") (*See* Hall, *supra*, at 11) and analog private line (Basket "3") (Affidavit of Alfred E. Kahn and William E. Taylor at 5 n.10, attached to *BOC Reclassification Opposition*, *supra* ("Kahn and Taylor Affidavit")) services are competitive.  However, there is considerable debate over the question of whether prices for regular residential and small business long distance ("residential, operator, and IMTS" or "basket 1") (Hall, *supra*, at 11; Kahn and Taylor Affidavit, *supra*, at 2; *AT&T FCC Opposition*, *supra*, at 47) services are also competitive.  Much of this controversy surrounds the related issues of the significance of price leadership patterns within the industry (Hall, *supra*, at 25), ease of entry (Hall, *supra*, at 26) and whether AT&T rates, exclusive of access charges and productivity measures, are constrained by (i.e., equal to) "price cap" regulated prices or by competition.  Hall, *supra*, at 18, 24; *AT&T FCC Opposition*, *supra*, at 48; Hausman PUC Testimony, *supra*, at 37-38.

139.  The potential competition doctrine has been challenged as unworkable.  *See*, e.g., J.R. Carter, *Actual Potential Entry Under Section 7 of the Clayton Act*, 66 Va.L.Rev. 1485 (1980).  In fact, "[t]here remains some uncertainty whether the future effect -- that is, the elimination of an actual potential competitor -- is covered by Clayton Act § 7 at all."  Areeda & Hovenkamp, *Antitrust Law*, ¶ 1116', at 931 (Supp. 1991) ("Areeda & Hovenkamp").

140.  Areeda and Hovenkamp believe that the *prima facie* case is actually more complicated. *See* Areeda & Hovenkamp, *supra*, ¶ 1116 at 931-33.

*country.[141]  Because licenses will be auctioned, it is impossible to identify which licenses particular bidders will obtain.  At this time, there is also considerable speculation about how long it will take before PCS services become fully operational.  Because of these and other uncertainties, we cannot find that AT&T had the requisite capacity, interest, and economic incentive to enter any California local or regional market currently served by McCaw.*

## VI.  CONCLUSION

*We conclude that the merger of AT&T and McCaw will have significant procompetitive effects.  AT&T and McCaw operations are highly complementary, and the merger of these companies is likely to significantly reduce the cost to McCaw of providing local and regional cellular services.  It is unlikely that the merger will have anticompetitive effects in other markets, such as those for interexchange services and related franchise rights.  Although the merger will obviously preclude further competition between AT&T and McCaw in certain wireless markets, we will not speculate about future competitive effects in geographic and product markets which do not currently exist.  On balance, the merger between AT&T and McCaw will result in higher quality services and lower rates for consumers who obtain cellular services from the merged company.*

*We also believe that the benefits of the merger to consumers would be enhanced if the Bell Operating Companies (BOCs) were allowed to fully compete against McCaw in the provision of regional cellular services.  The Modified Final Judgment (MFJ) adopted by the federal district court prohibits the BOCs from providing cellular long distance services.  The merger will strengthen the competitive advantage that McCaw already has over the BOCs in the markets for regional cellular services.  However, in our view, leveling the "playing field" on which McCaw and the BOCs compete would improve the quality of, and reduce the rates for, cellular services available to consumers in California, as in other states.  Because of the restrictions of the federal court decree, PacTel and the other BOCs, which are McCaw's strongest and most natural rivals, have been unable to take full advantage of their landline system in the placement and routing of cellular long distance calls.  In addition, the absence of a cellular long distance "bottleneck" indicates that BOC entry into the cellular long distance market would not enable their local telephone affiliates to engage in anticompetitive conduct against other cellular companies.*

*In the final analysis, it is essential that in the age of the "information highway," a full range of suppliers be allowed to compete in providing telecommunications services to the public, and that artificial restraints imposed by judicial decrees should be modified in order to advance competition within this field.  The MFJ, whatever its other merits, seems outdated as a framework for regulating competition in the cellular long distance market; indeed, that market did not exist, at least to any measurable degree, at the time that the decree was entered.  In the telecommunications industry, as in other markets, competition will accelerate and, we believe, result in higher quality and lower costs, and thus will provide significant benefits to the people of California and other states.*

---

141. *See Notice of Proposed Rule Making*, In re Implementation of Section 309(j) of the Communications Act Competitive Bidding, No. 93-253 (F.C.C. Oct. 12, 1993).

*Therefore, we conclude that this merger will not adversely affect competition within California but we urge the Commission to consider in a separate proceeding the possibility of supporting attempts by the BOCs to remove wireless from the interexchange restrictions of Section II of the MFJ.*

\* \* \* \* \*